******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CODY MEADOWS
(AC 40472)

Sheldon, Elgo and Flynn, Js.

*Syllabus*

Convicted of two counts each of the crimes of criminal violation of a standing
criminal protective order in violation of statute (§ 53a-223a) and threat-
ening in the second degree, the defendant appealed to this court. The
defendant's conviction stemmed from his actions toward the victim
while they appeared before the juvenile court in New Haven for a hearing
relating to their children. At the time, the defendant, pursuant to the
terms of a standing criminal protective order, was to have no contact
with the victim in any manner and was not to, inter alia, threaten or
harass her. In addition, the order included a limited exception that
contact with the victim was allowed only for purposes of visitation with
the children as directed by the family court. At the beginning of the
hearing, the defendant tried to make small talk with the victim, who
ignored him. He then told her that he loved her and asked her why she
had blocked her telephone, but she continued to ignore him and to look
toward the judge. At that point, the defendant threatened to harm the
victim and to kill her. The victim considered the defendant's statements
to be real threats, and she was fearful after she heard them. At the
conclusion of the hearing, the defendant met with a social worker.
During the meeting, the defendant appeared upset and made comments
to the social worker that he was going to hurt the victim. In the first
count of the substitute information, the state alleged that the defendant
had violated the standing criminal protective order by having contact
with the victim, and, in the second count, the state alleged that the
defendant had violated the protective order by threatening and harassing
the victim. After a jury trial, the defendant was convicted on all counts
against him. *Held*:

1. The defendant could not prevail on his unpreserved claim that his convic-
tion of two counts of criminal violation of a standing criminal protective
order violated his right to be free from double jeopardy because the
offenses charged in the counts arose out of the same act: the defendant's
conversation with the victim was separable into distinct acts, each
punishable as a separate offense but one of which involved a more
culpable conduct than the other, the defendant having first engaged in
conversation with the victim, unrelated to visitation with their children,
which amounted to contact with a person protected under the standing
criminal protective order, and then he proceeded to harass the victim
and to threaten her with death, which amounted to threatening and
harassing and violated additional terms of the standing criminal protec-
tive order, and, therefore, those two distinct acts, both undertaken by
the defendant, were separately punishable under § 53a-223a, and by
convicting and sentencing the defendant on two separate counts, one
for each distinct violation of the protective order, the court did not
punish the defendant twice for a single offense but, rather, convicted
him of two completed and distinct violations of the same statute; more-
over, the defendant's reliance on certain case law in support of his claim
that his conduct was one continuous criminal offense was misplaced,
as those cases were distinguishable from the present case in that the
defendant's conduct could be dissected into separate and distinct acts
prohibited by the same statute and was not a single, continuous criminal
offense, and the state charged him with two different acts that violated
two separate provisions of the protective order.

2. The defendant could not prevail on his claim that the trial court errone-
ously instructed the jury as to the second count of criminal violation
of a standing criminal protective order by providing the jury with an
incorrect definition of "harassing conduct," instead of using the higher
standard set forth in *State* v. *Larsen* ( 117 Conn. App. 202): although the
trial court defined the term "harassing" as "trouble, worry, or torment,"
which was different from the definition used in *Larsen*, the distinction
was not so great as to implicate the fairness of the defendant's trial, as

this court was satisfied that the trial court's definition conveyed equally and sufficiently the definition this court employed in *Larsen*, and, in instructing the jury as it did, the trial court employed the definition of harass that more commonly is applied to describe that element of § 53a-223a.

3. The defendant could not prevail on his claim that his conviction of threatening in the second degree pursuant to statute ([Rev. to 2015] § 53a-62 [a] [3]) should be reversed because it constituted a violation of the first amendment to the United States constitution, which was based on his claims that because, pursuant to *Virginia* v. *Black* (538 U.S. 343), the true threats doctrine now requires that he possessed a subjective intent to threaten the victim and the intent element of § 53a-62 (a) (3) may be satisfied with recklessness, that statute is unconstitutional, and that, by reading a subjective intent element into a federal criminal statute that penalized threats made in interstate commerce, the United States Supreme Court in *Elonis* v. *United States* (135 S. Ct. 2001) signaled approval of that element as essential to establish liability under the true threats doctrine of the first amendment: in *Elonis*, the court expressly declined to address any first amendment issues and left the elements of the true threats doctrine undisturbed, and, therefore, *Elonis* did not abandon the existing standard for the true threats doctrine sub silentio and had no bearing on whether the defendant must possess subjective intent for purposes of the true threats doctrine; moreover, the constitutional necessity of a subjective intent element was never at issue in *Black*, and, therefore, this court declined to read *Black* as making the change to the true threats doctrine as proposed by the defendant, and concluded that the objective standard, which has been the traditional standard in this state for the true threats doctrine, remained valid.

Argued May 22—officially released October 9, 2018

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of criminal violation of a standing criminal protective order and threatening in the second degree, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *O'Keefe, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*John L. Cordani, Jr.*, assigned counsel, for the appellant (defendant).

*Bruce R. Lockwood*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Laura Deleo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Cody Meadows, was convicted after a jury trial of two counts of criminal violation of a standing criminal protective order in violation of General Statutes § 53a-223a, one count of threatening in the second degree in violation of General Statutes (Rev. to 2015) § 53a-62 (a) (2)[1] and one count of threatening in the second degree in violation of § 53a-62 (a) (3). On appeal, the defendant claims that (1) the two convictions for violation of the standing criminal protective order violated his protection against double jeopardy, (2) the trial court erroneously instructed the jury as to the second count of violation of a standing criminal protective order, and (3) his conviction under § 53a-62 (a) (3) violated his right to freedom of speech under the first amendment to the United States constitution. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On September 1, 2015, the defendant, along with the victim,[2] the mother of his children, appeared before the juvenile court in New Haven for a hearing relating to their children. At the time, the defendant, pursuant to the terms of a standing criminal protective order, was to have no "contact [with the victim] in any manner, including by written, electronic or telephone [communication]" and was not to "assault, threaten, abuse, harass, follow, interfere with, or stalk the [victim]." As an exception, the order provided that "contact with [the victim was] only allowed for purposes of visitation as directed by [the] family court." As the hearing began, the defendant tried to "make small talk" with the victim, who ignored him. According to the victim, the defendant tried to tell her that he loved her and asked her why she had blocked her telephone, but she continued to ignore him and to look toward the judge. At this point, the defendant told the victim, "you're going to have problems when I get home, bitch." The victim then looked at the defendant who mouthed that he was going to "f---ing kill [her]." The victim told the defendant that she could hear him and that he should stop threatening her. The defendant remarked that he was not threatening; thereafter, he stopped trying to converse with the victim. The victim considered the defendant's statements to be real threats, and she was fearful after she heard them.

At the conclusion of the hearing, the defendant met, at the courthouse, with a social worker, Shannon McGinnis. During the meeting, the defendant appeared upset and told McGinnis that "if he's not with [the victim], he's going to make sure nobody else is with her." The defendant then said that, "if [the victim] chooses not to be with him, he will beat the f---ing shit out of her" and would "make her another Tracey Morton."[3] The defendant also said that "[h]e would kill

himself or die suicide by cops . . . ." At this point, McGinnis informed the defendant that his statements were concerning and that she would have to tell others about them; the defendant then stopped making such statements. Afterward, McGinnis met with the victim and informed her that during their meeting the defendant had threatened to hurt the victim. The victim thereafter contacted the state police and, after meeting with a state police officer, signed a statement that had been prepared by the officer. At trial, the victim testified that she believed the threats against her were real and that she had feared the defendant even though he was in prison, where he would remain for seven more months.

The state subsequently charged the defendant in a four count information with two counts of violation of a standing criminal protective order and two counts of threatening in the second degree. After a jury trial, the defendant was convicted on all four counts. This appeal followed.

I

The defendant first claims that his conviction for two counts of violation of a standing criminal protective order violated his right to be free from double jeopardy. He argues that count one of the information, which alleged a violation of the protective order by having contact with the victim, and count two of the information, which alleged a violation of the protective order by threatening and harassing the victim, arose out of the same act. Specifically, the defendant argues that his conversation with the victim inside the courtroom was a "single, continuous, [and] uninterrupted" act, and that it, therefore, cannot be dissected and penalized as two separate acts. Because the court rendered a judgment of conviction on two counts of violation of a standing criminal protective order resulting from that single conversation, the defendant claims his right against double jeopardy was violated.[4] In support of this argument, the defendant relies on *Rowe* v. *Superior Court*, 289 Conn. 649, 667–68, 960 A.2d 256 (2008), and *State* v. *Nixon*, 92 Conn. App. 586, 590–91, 886 A.2d 475 (2005). Additionally, the defendant argues that the language of § 53a-223a (c) exemplifies the legislature's intent to make a violation of a standing criminal protective order punishable only once. We disagree.

The defendant did not preserve this claim at trial, nor has he asked, on appeal, for review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[5] Nevertheless, "[a] defendant may obtain review of a double jeopardy claim, even if it is unpreserved, if he has received two punishments for two crimes, which he claims were one crime, arising from the same transaction and prosecuted at one trial . . . . Because the claim presents an issue of law, our review is plenary. . . . Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the

same act or transaction. . . . Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Citations omitted; internal quotation marks omitted.) *State* v. *Nixon*, supra, 92 Conn. App. 590–91.

Counts one and two of the state's long form information respectively charged that the defendant (1) "violate[d] the . . . protective order . . . by having contact with the protected person, in violation of . . . [§] 53a-223a" and (2) that the defendant "violate[d] the . . . protective order . . . by threatening and harassing the protected person, in violation of . . . [§] 53a-223a." Although these counts charge the defendant under the same statute, we conclude that the offenses charged did not arise out of the same act. Our courts have long held that "distinct repetitions of a prohibited act, however closely they may follow each other . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]." (Internal quotation marks omitted.) *State* v. *Miranda*, 260 Conn. 93, 120, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002); see also *State* v. *Morales*, 164 Conn. App. 143, 157, 136 A.3d 278 (same), cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016); *State* v. *James E.*, 154 Conn. App. 795, 833, 112 A.3d 791 (2015) (same), cert. denied, 321 Conn. 911, 136 A.3d 1273 (2016).

In other words, the fact that a defendant's two separate charges of violation of a standing criminal protective order arise from acts that closely follow one another is not determinative, by itself, of whether they constitute a single criminal offense. Rather, the question is whether each act charged by the state is susceptible of separation into parts which are separate, complete offenses and are thus punishable under the controlling statute. The contact described in the first count is less culpable than the conduct charged in the second. In the first count, the defendant is merely charged with prohibited contact with the victim. In the second, he is charged with threatening and harassing the victim. Each of these charges, based upon a separate act, was a separate offense that led to a separate conviction.

In *State* v. *Miranda*, supra, 260 Conn. 120, our Supreme Court considered whether the defendant, who had been convicted of two counts of assault in the first degree for injuries resulting to a minor child in his care, was being punished twice for the same offense.

In answering that question in the negative, our Supreme Court concluded that the defendant's failure to act, which had resulted in two separate injuries to the victim, constituted two separate acts of omission rather than one continuous failure to act. Id., 124. Similarly, in *State* v. *James E.*, supra, 154 Conn. App. 831, the defendant shot the victim twice and was convicted of two counts of assault of an elderly person in the first degree, which he claimed violated his right against double jeopardy. This court held that each shooting was a separate and distinct act because the defendant first removed the gun from his cabinet, turned toward the victim and shot him; the defendant then, approached the victim, grabbed his shirt and shot him again. Id., 834.

In the present case, the defendant's conversation with the victim likewise is separable into distinct acts, each punishable as a separate offense but one of which involves a more culpable conduct than the other.[6] It was one thing for the defendant to tell the victim he loved her; it was another to tell her, a few breaths later, that she was a bitch, whom he would kill when he got home. The defendant first engaged in conversation with the victim, unrelated to visitation with their children, which amounted to contact with a person protected under the standing criminal protective order. The defendant then proceeded to harass the victim and to threaten the victim with death, which amounted to threatening and harassing and violated additional terms of the standing criminal protective order. These two distinct acts, both undertaken by the defendant, were *separately* punishable under § 53a-223a. By convicting and sentencing the defendant on two separate counts, one for each distinct violation of the protective order, the court did not punish the defendant twice for a single offense. Rather, the court convicted the defendant of two completed and distinct violations of the same statute.

We also consider the defendant's reliance on *Rowe* and *Nixon* and conclude that this reliance is misplaced. In *Rowe* v. *Superior Court*, supra, 289 Conn. 675–76, our Supreme Court concluded that the plaintiff's refusal to answer two questions, constituted one, continuous act of contempt. In reaching that conclusion, however, the court specifically noted that the United States Supreme Court, in *Yates* v. *United States*, 355 U.S. 66, 78 S. Ct. 128, 2 L. Ed. 2d 95 (1957), had "recognized three circumstances in which multiple refusals to testify may be punished only as a single act of contempt: when the witness refuses to give any testimony at the outset and adheres to that refusal (blanket refusal); when the witness refuses to give testimony 'within a generally defined area of interrogation' (area of refusal) . . . and when the witness refuses to answer questions relating to the same fact or subject of inquiry (subject of inquiry)." (Citation omitted.) *Rowe* v. *Superior Court*, supra, 667. The court in *Rowe* then concluded that the

plaintiff's refusal to answer questions could be viewed either as a blanket refusal or refusal to answer questions on a particular subject area, because the subject on which the plaintiff had refused to provide testimony was the only subject matter on which the state had sought to question him. Id., 675. For that reason, the plaintiff's refusal to answer any questions was one continuous act of contempt. Id.

In the present case, there is no mandate similar to *Yates* by our Supreme Court that defines conduct protected under the double jeopardy clause in the context of violating a protective order. Moreover, unlike *Rowe*, the defendant's conduct in the present case can be dissected into separate and distinct acts prohibited by the same statute, albeit occurring within the same conversation. It is not, therefore, a single continuous criminal offense.

Similarly, we conclude that *Nixon* is inapposite. In *Nixon*, this court concluded that the defendant's rights under the double jeopardy clause were violated by his conviction of two counts of assault in the second degree, resulting from his stabbing the victim twice. *State* v. *Nixon*, supra, 92 Conn. App. 597. The stabbing was against one victim and was continuous, uninterrupted and close in time. Consequently, we rejected the state's claim in *Nixon* that each knife stab constituted a separate assault. In reaching that conclusion, we noted specifically that the state, in both counts of assault, had charged the defendant in the exact same manner. Id., 590. We noted, additionally, that the "defendant twice stabbed the same victim, at the same place and during the same time period, with the same instrument, with the same common intent to inflict physical injury during one continuous, uninterrupted assault." Id., 591. We, therefore, held that the conviction of two separate counts of assault, based on one continuous assault, violated double jeopardy. Id., 597.

In the present case, however, the state charged the defendant with two different acts that violated two separate provisions of the standing criminal protective order. Particularly, the defendant's initial words, his attempt to engage in "small talk," and his telling the victim that "he loved her," by themselves, likely would not support a conviction on the state's second count, which alleged a violation of the standing criminal protective order by threatening and harassing the victim. After engaging in this conversation, however, the defendant then went on to threaten to kill the victim, which constituted a separate act in violation of the protective order. For these reasons, the convictions did not violate the defendant's right to be free from double jeopardy. The acts charged were separate and distinct, and it matters not that they arose from the same conversation.[7] See *State* v. *Miranda*, supra, 260 Conn. 119.

II

The defendant next claims that the trial court erroneously instructed the jury as to the second count of violation of a standing criminal protective order. Specifically, the defendant claims that the trial court provided the jury with the incorrect definition of "harassing conduct," for the second count of violation of a standing criminal protective order. The defendant contends that the court instead should have used the definition set forth in this court's opinion in *State* v. *Larsen*, 117 Conn. App. 202, 209 n.5, 978 A.2d 544, cert. denied, 294 Conn. 919, 984 A.2d 68 (2009), which, according to the defendant, set a higher threshold for "harassing" conduct. We disagree.

The defendant did not object to the court's charge at trial and submitted no request to charge suggesting the language he now argues on appeal was mandated, nor does he now seek review pursuant to *State* v. *Golding*, supra, 213 Conn. 233. We extend review, however, pursuant to *State* v. *Elson*, 311 Conn. 726, 754–55, 91 A.3d 862 (2014), because the claim that the jury was not instructed properly as to an essential element of a crime is a claim of constitutional magnitude. "It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . A claim that the trial court failed to instruct the jury adequately on an essential element of the crime charged necessarily involves the defendant's due process rights and implicates the fairness of his trial." (Internal quotation marks omitted.) *State* v. *Felder*, 95 Conn. App. 248, 258, 897 A.2d 614, cert. denied, 279 Conn. 905, 901 A.2d 1226 (2006).

In the second count of its information, the state charged the defendant with violation of a standing criminal protective order by "threatening and harassing the protected person . . . ." At trial, the court instructed the jury as to this count as follows: "In this case, the state alleges that threatening or harassing the complainant was forbidden by the order, and you have the order. As far as what's the definition of a threat, use the same definition that I'm going to give you on threatening. As far as what's harassing, harassing *is to trouble, worry, or torment*; that's the legal definition. *Trouble, worry, or torment.* A person acts intentionally with respect to conduct when his conscious objective is to engage in such conduct. That's general intent. In summary, the state must prove beyond a reasonable doubt (1) that a court issued a standing criminal protective order against the defendant; and (2) the defendant violated a condition of that order; and in count two, we're talking about an allegation that he violated a prohibition in an order that required him not to threaten or harass the complainant." (Emphasis added.)

The plaintiff contends that in using the words "trouble, worry, or torment," the trial court improperly defined the term "harassing" to the jury, which, instead,

is defined by the higher standard set forth in *Larsen*. In that case, after a trial to the court, the defendant was convicted of two counts of criminal violation of a protective order, and one count of criminal violation of a restraining order. *State* v. *Larsen*, supra, 117 Conn. App. 203. On appeal, the defendant claimed that the state failed to prove that she had the requisite intent to violate the orders. Id., 204. In rejecting the defendant's claim, we noted that the dictionary definition of "harass" was "to annoy persistently . . . to create an unpleasant or hostile situation . . . by uninvited and unwelcome verbal or physical conduct." (Internal quotation marks omitted.) Id., 209 n.5. In light of this dictionary definition, we concluded that the court reasonably could have found that the defendant harassed the victim. Id., 210.

In the present case, although the definition employed by the trial judge is different from the one this court used in *Larsen*, the distinction is not so great as to implicate the fairness of the defendant's trial. Specifically, the defendant's contention that "troubled" is a much lower standard than to "annoy persistently" is unavailing. The word "annoy" means to "disturb or irritate especially by repeated acts." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 50. "Trouble" means to "agitate mentally or spiritually" and is synonymous with "worry," which means "to assail with rough or aggressive attack or treatment" or to "subject to *persistent or nagging* attention or effort" and is synonymous with "torment." (Emphasis added.) Id., 1342, 1444. "Torment," in turn, means "to cause severe, usually, *persistent* or *recurrent* distress." (Emphasis added.) Id., 1319. When compared fully, we are satisfied that the definition, "trouble, worry, or torment," conveys equally and sufficiently the definition this court employed in *Larsen*. Accordingly, we reject the defendant's argument that the use of this definition resulted in constitutional error.

Moreover, in using this instruction, the trial court employed the definition of "harass" that more commonly is applied to describe that element of § 53a-223a (c). See, e.g., *State* v. *Hersey*, 78 Conn. App. 141, 161, 826 A.2d 1183 (considering different instructional challenge to charge that defined "harass" as "to trouble, worry or torment" [internal quotation marks omitted]), cert. denied, 266 Conn. 903, 832 A.2d 65 (2003); *State* v. *Charles*, 78 Conn. App. 125, 130, 826 A.2d 1172 (same), cert. denied, 266 Conn. 908, 832 A.2d 73 (2003).[8] Consequently, we are not persuaded that the court erroneously instructed the jury on this element.

### III

The defendant finally claims that his conviction for threatening in the second degree in violation of § 53a-62 (a) (3), should be reversed because it constitutes a violation of the first amendment to the United States

constitution. That section provides in pertinent part that "[a] person is guilty of threatening in the second degree when . . . such person threatens to commit any crime of violence with . . . reckless disregard of the risk of causing such terror . . . ." General Statutues (Rev. to 2015) § 53a-62 (a) (3). The defendant argues that pursuant to *Virginia* v. *Black*, 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003), the true threats doctrine now requires that he possess a subjective intent to threaten the victim. Because the intent element of § 53a-62 (a) (3) may be satisfied with recklessness, the defendant claims that the statute is unconstitutional. Additionally, the defendant argues that the decision of our Supreme Court in *State* v. *Krijger*, 313 Conn. 434, 97 A.3d 946 (2014), rendered after *Black*, left open the constitutional question he now poses. Moreover, the defendant asserts that *Elonis* v. *United States*, U.S. , 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015), a more recent decision of the United States Supreme Court, signals the court's approval of a subjective intent requirement to make speech punishable under the true threats doctrine. Because *Elonis* was decided after our Supreme Court's decision in *Krijger*, the defendant urges us to abandon the objective standard applied by our Supreme Court in that case and to adopt the subjective intent standard in *Elonis*. We are not persuaded by the defendant's arguments.

Although the defendant makes this claim for the first time on appeal and does not seek review under *Golding*, we review his claim pursuant to *State* v. *Elson*, supra, 311 Conn. 754–55. "The constitutionality of a statute presents a question of law over which our review is plenary." (Internal quotation marks omitted.) *State* v. *Book*, 155 Conn. App. 560, 564, 109 A.3d 1027, cert. denied, 318 Conn. 901, 122 A.3d 632 (2015), cert. denied, U.S. , 136 S. Ct. 2029, 195 L. Ed. 2d 219 (2016). "True threats encompass those statements [through which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . . In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . [A]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners. . . . Prosecution under a statute prohibiting threatening

statements is constitutionally permissible [as] long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." (Citations omitted; internal quotation marks omitted.) *State* v. *Krijger*, supra, 313 Conn. 449–50.

The defendant's claim turns on two cases of the United States Supreme Court, *Virginia* v. *Black*, supra, 538 U.S. 343, and *Elonis* v. *United States*, supra, 135 S. Ct. 2001. Because the defendant argues that our Supreme Court has not had the opportunity to reconsider our jurisprudence in light of the United States Supreme Court's decision in *Elonis*, we first address his claim based on that case.[9] The defendant asks us to read *Elonis* as establishing a subjective intent element for true threats under the first amendment to the United States constitution. He acknowledges, however, that in *Elonis*, the United States Supreme Court construed 18 U.S.C. § 875 (c) (2012), a federal criminal statute that penalized threats made in interstate commerce. The defendant argues, nevertheless, that the United States Supreme Court, by reading a subjective intent element into that statute, signaled an approval of that element as essential to establish liability under the true threats doctrine of the first amendment.

As a conceptual matter, we cannot agree with this argument. To be constitutionally valid, a statute must provide at least as much protection as the federal constitution. It follows, therefore, that a statute can provide greater, but not less, protection than the constitution. Concluding that 18 U.S.C. § 875 (c) requires subjective intent, the United States Supreme Court held that the *statute* required a higher mens rea. *Elonis* v. *United States*, supra, 135 S. Ct. 2010 ("[w]hen interpreting federal criminal statutes that are silent on the required mental state, we read into the statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct" [internal quotation marks omitted]); see also *United States* v. *White*, 810 F.3d 212, 220 (4th Cir. 2016) ("*Elonis* abrogates our prior holding that liability under [18 U.S.C.] § 875 (c) can turn solely on how a recipient would interpret a statement, without regard to whether the speaker intended it as a threat. . . . . But *Elonis* does not affect our constitutional rule that a 'true threat' is one that a reasonable recipient familiar with the context would interpret as a serious expression of an intent to do harm." [citation omitted]), cert. denied,      U.S.      , 136 S. Ct. 1833, 194 L. Ed. 2d 837 (2016). By contrast, the court expressly declined to address any first amendment issues; see *Elonis* v. *United States*, supra, 135 S. Ct. 2013; thereby leaving the elements of the true threats doctrine undisturbed. We, therefore, cannot join the defendant's assumption that the United States Supreme Court abandoned the existing standard for the true

threats doctrine sub silentio. See *Shalala* v. *Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000) (United States Supreme Court "does not normally overturn, or so dramatically limit, earlier authority sub silentio"). Accordingly, we conclude that *Elonis* has no bearing on whether the defendant must possess a subjective intent for purposes of the true threats doctrine. Whether *Black* affected the true threats doctrine, however, is a different question and one which was not addressed by our Supreme Court in *Krijger*, but which the defendant now invites us to consider.

In *Virginia* v. *Black*, supra, 538 U.S. 343, the United States Supreme Court considered whether a Virginia statute that criminalized cross burning violated the first amendment. The statute made it unlawful for "any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place." (Internal quotation marks omitted.) Id., 348. It provided further that "[a]ny such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons." (Internal quotation marks omitted.) Id. It was this latter part of the statute that a plurality of the court struck down as unconstitutional. Id., 367. In reaching this conclusion, the court first recited the principle, now well established in this state, that " '[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Id., 359. The court went on to add, however, that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Id., 360. It is this language that the defendant regards as marking a shift from the usual objective standard to a subjective intent requirement for true threats. We are not persuaded.

The language on which the defendant relies is found in part III of *Black*, which upheld the constitutionality of the intent requirement in the Virginia statute. See id., 363 ("[a] ban on cross burning carried out with the intent to intimidate is fully consistent with our holding in *R.A.V.* [v. *St. Paul*, 505 U.S. 377, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992)] and is proscribable under the First Amendment"). Although this holding declares the constitutionality of the intent requirement for the Virginia statute, it says nothing about the traditional objective standard for true threats. See, e.g., *Elonis* v. *U.S.*, supra, 135 S. Ct. 2016 (Alito, J., concurring) (arguing that objective standard should be applied post-*Black*). In other words, the constitutional necessity of a subjective intent was never at issue in part III of *Black*. Consequently, we decline to read it that way.

In part IV of *Black*, a plurality of four justices went further and found the prima facie provision of the Virginia statute to be unconstitutional on its face. In reaching that conclusion, the plurality noted that "[t]he act of burning a cross may mean that a person is engaging in constitutionally proscribable intimidation. But that same act may mean only that the person is engaged in core political speech. The prima facie evidence provision in this statute blurs the line between these two meanings of a burning cross . . . [and] makes no effort to distinguish among these different types of cross burnings." *Virginia* v. *Black*, supra, 538 U.S. 365–66. Whatever reservations we might have about the court's reasoning, the court's ratiocination falls far short of bringing the traditional objective standard into question. In fact, it may even be read as suggesting that the prima facie provision *lacked* objectivity because it lacked any standard at all. See *United States* v. *Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012), overruled on other grounds by *Elonis* v. *United States*, supra, 135 S. Ct. 2001. Consequently, we decline to read *Black* as marking the sea change to the true threats doctrine that the defendant proposes.[10] Thus the objective standard, which has been the traditional standard in this state for the true threats doctrine, remains valid. Accordingly, § 53a-62 (a) (3) is constitutionally sound.[11] Because the defendant's sole challenge to his conviction under § 53a-62 (a) (3) was constitutional, our treatment of his claim ends here.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Number 16-67 of the 2016 Public Acts (P.A. 16-67) amended subsection (a) of § 53a-62 by redesignating the existing subdivisions (2) and (3) as subdivision (2) (A) and (B) without modifying the language of that provision. We refer to the 2015 revision of § 53a-62 (a) (3) because that is the statute under which the defendant was charged and convicted.

[2] In accordance with our policy of protecting the privacy interest of the victim of a criminal violation of a protective order, we decline to identify the victim or others through whom the victim's identity may be ascertained.

[3] During deliberations, the jury submitted a note to the trial court asking who Tracey Morton was, whereupon the court responded that there was no evidence in the record from which that question could be answered.

[4] In his appellate brief, the defendant cites to article first, § 9, of the Connecticut constitution, but makes no claim that the double jeopardy protection under our constitution exceeds that provided by the federal constitution. As our appellate courts repeatedly have observed, "the absence of an explicit constitutional double jeopardy provision [in our state constitution] strongly suggests that the incorporated common-law double jeopardy protection mirrors, rather than exceeds, the federal constitutional protection." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Burnell*, 290 Conn. 634, 652–53, 966 A.2d 168 (2009). Because the defendant does not claim otherwise, and has not briefed such a claim, we review his double jeopardy claim only under the federal constitution. See *State* v. *Baker*, 168 Conn. App. 19, 21 n.5, 145 A.3d 955, cert. denied, 323 Conn. 932, 150 A.3d 232 (2016).

[5] Under the well established principles of *Golding*, as revised in *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation

exists and deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. *State* v. *Golding*, supra, 213 Conn. 239–40. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *In re Yasiel R.*, supra, 779 n.6.

[6] At oral argument before this court, the defendant's counsel cited to our Supreme Court's decision in *State* v. *Bernacki*, 307 Conn. 1, 52 A.3d 605 (2012), cert. denied, 569 U.S. 918, 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013), for the proposition that it prohibits an inspection of how a protective order was violated for purposes of double jeopardy. To the extent the court's decision in *Bernacki* can be read that way, it pertains to the application of the same elements analysis from the United States Supreme Court case of *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). Because the same elements analysis is not at issue in this case, and neither the defendant nor the state claims that it is, *Bernacki* does not preclude us from examining the terms of the standing criminal protective order.

[7] We are also unpersuaded by the defendant's argument that the use of the word "involves" in § 53a-223a (c) signifies the legislature's intent to make the offense punishable only once. A plain reading of the statute reveals no such intent and, given the unambiguous language of the statute, we will not look for further intent of the legislature not expressed within the statute itself. See *Cornelius* v. *Arnold*, 168 Conn. App. 703, 717, 147 A.3d 729 (2016), cert. denied, 324 Conn. 908, 152 A.3d 1245 (2017).

[8] By contrast, *Larsen* appears to be the only published Connecticut case to cite to the dictionary definition that the defendant in this case invokes as a constitutional requirement.

[9] Contrary to the defendant's assertions, our Supreme Court had the opportunity to examine these issues post-*Elonis* in *State* v. *Pelella*, 327 Conn. 1, 170 A.3d 647 (2017). After the current case was argued before this court, our Supreme Court decided *State* v. *Taupier*, 330 Conn. 149,     A.3d (2018), which held that General Statutes § 53a-61aa (a) (3) is not unconstitutional under the free speech provisions of the federal and state constitutions because the specific intent to terrorize the victim was not an element of the crime.

*Taupier* was a case in which all threats directed against the victim were not directly addressed to the victim, but instead, were made to third parties. However, in the case before us, there was direct evidence before the jury from the victim's testimony that the defendant told her that he would kill her. The defendant's conviction was therefore not dependent on other evidence of the defendant's threats against the victim that were voiced to a third-party social worker. We therefore decline the defendant's appellate counsel's postargument suggestion made under Practice Book § 67-10 to review the court's jury charge for plain error, in light of *Taupier*. Plain error review is a rule of reversibility, which we conclude is inappropriate.

[10] In reaching this conclusion we align with a majority of federal appellate courts that has declined to read *Black* as altering the traditional objective standard. See *United States* v. *Castillo*, 564 Fed. Appx. 500, 504 (11th Cir.), cert. denied,     U.S.     , 135 S. Ct. 438, 190 L. Ed. 2d 333 (2014); *United States* v. *Clemens*, 738 F.3d 1, 12 (1st Cir. 2013); *United States* v. *Elonis*, 730 F.3d 321, 332 (3d Cir. 2013), rev'd on other grounds,     U.S.     , 135 S. Ct. 2001 (2015); *United States* v. *Nicklas*, 713 F.3d 435, 440 (8th Cir. 2013); *United States* v. *Jeffries*, supra, 692 F.3d 479–81; *United States* v. *White*, 670 F.3d 498, 508 (4th Cir. 2012).

[11] We note additionally that the appellate courts in this state have had the opportunity to consider these questions and to revise our jurisprudence in light of *Black*. See, e.g., *State* v. *Pelella*, supra, 327 Conn. 1; *State* v. *Krijger*, supra, 313 Conn. 434; *State* v. *Tarasiuk*, 125 Conn. App. 544, 8 A.3d 550 (2010). Specifically, in *Krijger*, although our Supreme Court declined to address the question the defendant raises in this claim, it went on to apply the traditional objective standard. See *State* v. *Krijger*, supra, 460. Given the recent and frequent application of the objective standard for true threats by our Supreme Court, this court is not free to depart from it. *State* v. *Inglis*, 151 Conn. App. 283, 293 n.13, 94 A.3d 1204, cert. denied, 314 Conn. 920, 100 A.3d 851 (2014), cert. denied,     U.S.     , 135 S. Ct. 1559, 191 L. Ed. 2d 647 (2015).