J-S12006-19

2019 PA Super 277

| IN THE INTEREST OF: J.J.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.J.M., A MINOR | : | No. 1245 MDA 2018 |

Appeal from the Dispositional Order Entered May 14, 2018
In the Court of Common Pleas of Luzerne County Juvenile Division at
No(s):  CP-40-JV-0000119-2018

BEFORE:  BOWES, J., DUBOW, J., and MUSMANNO, J.

OPINION BY BOWES, J.:                              **FILED SEPTEMBER 10, 2019**

J.J.M. appeals from the dispositional order entered following his delinquency adjudication for terroristic threats.  We affirm.

At the time of the events in question, Appellant was a fifteen-year-old student at West Side Career and Technology Center, a vocational high school in Luzerne County, Pennsylvania.  The juvenile court summarized the testimony offered at the adjudication hearing arising from those events as follows.

> M.W., a fifteen-year-old student at West Side C.T.C. testified that on February 20, 2018 she was in school and is familiar with [Appellant].  M.W. identified [Appellant] for the record and related that they have several classes together.  She testified that she heard [Appellant] make statements regarding "things in reference to death and such," in the hallway, between classes and she was within two to three feet of him at the time the statements were made.

> M.W. further testified that [Appellant] stated "he wanted to beat the record of 19."  She testified he was either talking to someone or just said it and it was not directly said to her.  She then notified school administrators Mr. Rava and Mr. Paulauskas.  She further testified she went to the school authorities "because

it was concerning due to past statements. I felt it needed to be taken seriously."

When asked on cross-examination if she felt that she needed to talk to [Appellant] to ask what he meant by the statement she replied "no, I felt it was unneeded." She stated the statements concerned her because he's shown signs of possibly being violent.

The Commonwealth next called K.S. a fourteen-year-old student at West Side C.T.C. K.S. testified that she was in school on February 20, 2018 and did not have any conversations with [Appellant] that day. She stated she did have conversations with him a few weeks before.

K.S. testified [Appellant] said "he doesn't think people deserve to live and everyone should just die." She went to school administrator Mr. Paulauskas and reported this incident.

K.S. testified that she did not immediately report the statement to school administration however, a few weeks later after she heard other statements he made, she then spoke up about it because it was a serious problem. She stated "I was scared, like, I was nervous. I was scared because I didn't know what was going to happen. There was previously school shootings like you never know. I spoke with Mr. Paulauskas and Mr. Rava, I approached them because my friends approached me about him saying he was going to beat the record. She stated she was concerned and reported this information to school personnel and believed [Appellant] was then suspended from school. He was no longer at school."

K.S. further testified about previous statements that she heard coming out of J.M's mouth that worried her. She stated the statement that she heard was "that he thought people should die, people like shouldn't live. That's what I heard myself." She further related that other people told her about other statements he had made.

On cross-examination K.S. was asked if she was generally uneasy and anxious because of matters recently reported in the news. She testified "yes, I was uneasy and anxious because there had recently been school shootings."

- 2 -

> Richard Rava, Administrator of West Side [C.T.C.] testified. He indicated he is the Assistant Director/Principal. He is familiar with [Appellant]. When asked if action was taken by the school regarding [Appellant]'s conduct, Mr. Rava testified that [Appellant] was expelled from school.

Juvenile Court Opinion, 7/16/18, at 2-4 (some punctuation corrected; citations omitted).

Upon this evidence, a juvenile hearing officer adjudicated Appellant delinquent of terroristic threats. Appellant challenged the hearing officer's recommendation, and the juvenile court scheduled a *de novo* hearing. The parties stipulated to the introduction of the prior testimony at that hearing to inform the court's determination. On May 14, 2018, the juvenile court adjudicated Appellant delinquent of terroristic threats under 18 Pa.C.S. § 2607(a)(3), and provided that the disposition order drafted by the hearing officer remain in effect. That order, *inter alia*, placed Appellant on probation, required that he comply with mental health recommendations, and prohibited Appellant from having any contact with weapons. Appellant filed a timely post-dispositional motion, which was denied by order of July 16, 2018. Appellant thereafter filed a timely notice of appeal.

Appellant presents the following questions for this Court's review:

1. Whether the Commonwealth presented sufficient evidence to conclude that [Appellant] violated 18 Pa.C.S.A. § 2706(a)(3)?

2. Whether the terroristic threats statute violates [Appellant's] 1st Amendment right under the United States Constitution to free speech?

3.     Whether the terroristic threats statute is unconstitutional and, as applied, in violation of [Appellant's] due process rights under the 5th and 14th Amendments of the United States Constitution?

Appellant's brief at 2.

We begin with the law applicable to Appellant's contention that the evidence offered by the Commonwealth is insufficient to sustain his adjudication. "In a juvenile proceeding, the hearing judge sits as the finder of fact." *In re L.A.*, 853 A.2d 388, 391 (Pa.Super. 2004). "The weight to be assigned the testimony of the witnesses is within the exclusive province of the fact finder." *Id*.

When considering a challenge to the sufficiency of the evidence following an adjudication of delinquency, we must review the entire record and view the evidence in the light most favorable to the Commonwealth.

In determining whether the Commonwealth presented sufficient evidence to meet its burden of proof, the test to be applied is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, there is sufficient evidence to find every element of the crime charged. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by wholly circumstantial evidence.

*In the Interest of J.G.*, 145 A.3d 1179, 1188 (Pa.Super. 2016) (citations omitted).

Our legislature has defined the crime of terroristic threats as follows:

A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to:

(1) commit any crime of violence with intent to terrorize another;

- 4 -

(2) cause evacuation of a building, place of assembly or facility of public transportation; or

(3) otherwise cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience.

18 Pa.C.S. § 2706(a).

This Court has held that the result threatened by the speaker need not be specifically articulated if it "may be inferred from the nature of the statement and the context and circumstances surrounding the utterance of the statement." *In re B.R.*, 732 A.2d 633, 636 (Pa.Super. 1999) (internal quotation marks omitted).

"[T]he harm sought to be prevented by the statute is the psychological distress that follows from an invasion of another's sense of personal security." *Commonwealth v. Kline*, 201 A.3d 1288, 1290 (Pa.Super. 2019) (internal quotation marks omitted). As such, "neither the ability to carry out the threat nor a belief by the person threatened that it will be carried out is an essential element of the crime." *Id*. (cleaned up).

The Commonwealth alleged that Appellant engaged in conduct that constituted terroristic threats under subsections (a)(1) and (a)(3) of § 2706.[1] The juvenile court determined that an adjudication of delinquency was

---

[1] Appellant was also charged with, but not found to be factually responsible for, disorderly conduct under 18 Pa.C.S. § 5503(a)(4). **See** Juvenile Court Opinion, 7/16/18, at 1.

unwarranted under subsection (a)(1) (threat made with intent to terrorize),[2] but concluded that Appellant made a threat with reckless disregard for the risk that it would cause terror or public inconvenience. Juvenile Court Opinion, 7/16/18, at 1, 9. Therefore, it adjudicated Appellant delinquent pursuant to subsection (a)(3).

Appellant challenges the sufficiency of the evidence to sustain this adjudication on two grounds. First, he contends that his statements do not amount to a "threat." Appellant's brief at 8-11. Second, Appellant maintains that the evidence does not support a finding of a *mens rea* beyond mere negligence, because there was no evidence that Appellant knew that anyone who overheard his statement would associate it with previous school shootings. *Id*. at 12-13. We are not persuaded by either argument.

To reiterate, § 2706(a)(3) provides: "A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to: . . . cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience." 18 Pa.C.S. § 2706(a)(3). As the term "threat" is not

---

[2] Indeed, in addressing a sufficiency challenge raised by Appellant at the adjudication hearing, the Commonwealth appears to have conceded that it failed to present evidence that Appellant intended to terrorize anyone. *See* N.T. Adjudication Hearing, 4/26/18, at 45 ("A threat was made to the point that it violated people's sense of security. . . . And that's really why we're here, Your Honor. It's not what [Appellant] intended, but it's the effect that he had on other people.")

defined in the statute, we imbue the word with its ordinary meaning. *Commonwealth v. Kelley*, 801 A.2d 551, 555 (Pa. 2002) ("We construe non-technical words and phrases in statutes, which remain undefined, according to their ordinary usage.").

Black's Law Dictionary offers the following definitions of "threat":

1.     A communicated intent to inflict harm or loss on another or on another's property, esp. one that might diminish a person's freedom to act voluntarily or with lawful consent; a declaration, express or implied, of an intent to inflict loss or pain on another . . . .

 2.     An indication of an approaching menace; the suggestion of an impending detriment . . . .

3.     A person or thing that might well cause harm . . . .

Black's Law Dictionary (11th ed. 2019).  This Court has also acknowledged similar definitions from different sources, namely "an indication of something impending and usu[ally] undesirable or unpleasant," and "an expression of intention to hurt, destroy, punish, etc." *Commonwealth v. Baker*, 766 A.2d 328, 330 n.5, 332 (Pa. 2001).

At the adjudication hearing, M.W. stated that she personally heard Appellant say on February 20, 2018, in the hallway of the school between classes, that he "wanted to beat the record of 19."[3]  N.T. Adjudication Hearing, 4/26/18, at 14.  K.S. heard Appellant's statement about wanting to "beat the

---

[3] M.W. indicated she was not absolutely sure that nineteen was the number Appellant indicated.  N.T. Adjudication Hearing, 4/26/18, at 14.

- 7 -

record" indirectly, through other students. *Id*. at 25. Both M.W. and K.S. indicated that they took Appellant seriously because he had in the past spoken to them about death and that people should die. *Id*. at 13, 29. K.S. further testified that she had been generally uneasy and anxious at the time she heard of Appellant's statement, as there had been a recent school shooting in the news.[4] *Id*. at 31. M.W. did not inquire of Appellant as to the meaning of his statement, as she felt explanation was unneeded. *Id*. at 18.

Appellant argues that the actual words he said, standing alone, have "no logical connection which can equate the statement with harm. . . . [Appellant] could have been speaking about participation in a video game or any other competition[.]" Appellant's brief at 9. Appellant made the same argument to the juvenile court. *See* N.T. Adjudication Hearing, 4/26/18, at 41-42. However, the juvenile court rejected it, noting that it was made in the presence of students who cannot help but be aware in this day and age of "the proliferation of incidents which have occurred throughout this country." Juvenile Court Opinion, 7/16/18, at 8. We agree that, from this context and the circumstances surrounding Appellant's statement, the words expressed an

---

[4] Appellant's statement was uttered six days after seventeen victims were killed at Marjory Stoneman Douglas High School in Parkland, Florida, eclipsing the Columbine High School shooting as the most deadly high school shooting in United States history. *See*, *e.g.*, Elizabeth Elizalde, These are the deadliest school shootings in U.S. history, New York Daily News (February 14, 2018, 8:11 PM) http://www.nydailynews.com/news/national/deadliest-school-shootings-u-s-history-article-1.3821513.

intent to cause harm and an indication of impending menace. Hence, Appellant made a threat within the meaning of § 2607.

Further, we conclude that the evidence sufficiently established that Appellant made his threat with reckless disregard for the risk that it would cause terror. Again, the facts are that, while the news was dominated by the deadliest high school shooting in this country's history, Appellant proclaimed in a high school hallway, between classes, loud enough for other students to hear, that he wanted to "beat the record of 19."[5] We do not hesitate to conclude that Appellant consciously disregarded a substantial and unjustifiable risk that his threat would terrorize his fellow students. **See** 18 Pa.C.S. § 302(a)(3) (defining recklessness).

Moreover, the Commonwealth offered evidence that students who heard Appellant's statement directly, or heard of it indirectly, experienced the invasion of personal security that the law seeks to prevent.[6] **See** N.T.

_____

[5] We reiterate that, although the Parkland shooting resulted in seventeen deaths rather than nineteen, M.W. indicated she was less than certain of the number that Appellant stated. N.T. Adjudication Hearing, 4/26/18, at 14.

[6] Appellant argues that he should not be tasked with having anticipated that other students would have communicated his threat to K.S., to whom he previously expressed his view that people should just die. Appellant's brief at 11. However, we find that Appellant's "beat the record" statement, made within a week of the Parkland shooting, was itself alone sufficient to constitute a terroristic threat. Further, the fact that not all of his victims received the threat directly is of no moment. **See**, **e.g.**, **In re L.A.**, 853 A.2d 388 (Pa.Super. 2004) (affirming conviction based upon terror instilled into victim who learned of the appellant's threats through a third party).

Adjudication Hearing, 4/26/18, at 15 (M.W. testifying that she was "concerned" by Appellant's statement), 25 (K.S. indicating that Appellant's sentiments made her "scared"). **Accord Commonwealth v. Bunting**, 426 A.2d 130, 132 (Pa.Super. 1981) (holding evidence was sufficient to sustain conviction where the victims "developed only concern for the safety of themselves and others" rather than experienced "terror" or "fear").

Appellant's remaining questions present challenges to the constitutionality of his adjudication. Specifically, Appellant contends that his adjudication based upon recklessness violates his First Amendment free speech rights, and that § 2706 is unconstitutionally vague both on its face and as applied. Appellant's brief at 14, 22.

We first examine Appellant's First Amendment claim, and begin by noting that children do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." **Tinker v. Des Moines Indep. Cmty. Sch. Dist.**, 393 U.S. 503, 506 (1969). "On the other hand, the [United States Supreme] Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." **Id**. at 507. "Part of a school's awesome charge is to balance the exercise of rights that enrich learning with order and a safe and productive school environment." **J.S. ex rel. H.S. v. Bethlehem Area Sch. Dist.**, 807 A.2d 847, 855 (Pa. 2002), *abrogation on other grounds*

*recognized by* ***Commonwealth v. Knox***, 190 A.3d 1146, 1156-57 (Pa. 2018).

In light of "of the numerous incidents of violence which have occurred in the school setting" in the past two decades, "this Court recognizes the seriousness of any threat made by a student against a teacher or another student." ***In re J.H.***, 797 A.2d 260, 263 (Pa.Super. 2002).

> Indeed, we have acknowledged that in order to facilitate the strong public interest in reducing the level of violence within our schools and in the community in general, that it is of paramount importance that our schools must be kept as centers of learning free of fear for personal safety. This concept of safety encompasses the notion of teachers and students being secure and free from the fear of becoming victims of senseless violence.

***Id***. (cleaned up) (quoting ***In re B.R.***, ***supra*** at 639).

Turning to the constitutional right at issue, we observe that the First Amendment, made applicable to this Commonwealth through the Fourteenth, prohibits the government from abridging the right to free speech. U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech[.]"); ***Knox***, ***supra*** at 1153. While the government generally may not restrict speech based upon its substance, even content-based restrictions on expression are constitutionally permissible when the expression "is of such slight social value as a step to truth that any benefit that may be derived from it is clearly outweighed by the social interest in order and morality." ***Knox***, ***supra*** at 1154 (cleaned up). Accordingly, it is well-settled that "[t]hreats of violence fall outside the First Amendment's protective scope because of the need to protect individuals from the fear of violence, from the disruption that

fear engenders, and from the possibility that threatened violence will occur." *Id*. (cleaned up).

To be proscribed and actionable, the threat must be a "true threat," and not merely political hyperbole or an expression of political dissent. ***Compare In re J.H.***, ***supra*** at 263 (affirming adjudication upon student's "promise" that if teacher reported student's conduct to his probation officer "it would be the last thing she ever did"); ***with Watts v. United States***, 394 U.S. 705 (1969) (overturning conviction under statute prohibiting threats against the President based upon draftee's statement that if he is forced into the military and given a rifle, "the first man I want in my sights is L.B.J.").

In determining whether particular speech constitutes a true threat, consideration of both the speaker's scienter and the contextual circumstances is required. ***Knox***, ***supra*** at 1156-58. Relevant contextual factors include "whether the threat was conditional, whether it was communicated directly to the victim, whether the victim had reason to believe the speaker had a propensity to engage in violence, and how listeners reacted to the speech." *Id*. at 1159. The inquiry must incorporate some examination of the speaker's mental state, as the government cannot prosecute speech based solely upon an "objective, reasonable listener standard" following the High Court's fractured decision in ***Virginia v. Black***, 538 U.S. 343 (2003) (O'Connor, J. announcing the judgment of the Court and delivering the opinion of the Court in part) (holding statute prohibiting cross burning with an intent to intimidate

did not violate First Amendment, but provision that burning cross in view of the public constituted prima facie evidence of intent to intimidate was unconstitutional). **See Knox**, **supra** at 1156. **Accord Elonis v. United States**, 135 S.Ct. 2001, 2012 (2015) (holding conviction under federal statute could not stand because the jury was instructed that the prosecution was required to prove only that a reasonable person would consider the defendant's communication to be a threat).

There is no question that true threats made with the intent to terrorize fall outside of the First Amendment's protection. What has not been decided by either our Supreme Court or the United States Supreme Court is whether threats communicated not with the subjective intent to terrorize, but instead with reckless disregard for the risk of causing terror in the listener, is permissible under the First Amendment. Appellant argues that liability based on mere recklessness *per se* violates the First Amendment. Appellant's brief at 18. In the alternative, Appellant contends that examination of the full context of his statements reveals that they fall outside of the true threat category. **Id**.

Our Supreme Court, pointing specifically to the statute at issue in the case *sub judice*, expressly declined to address the issue of whether liability imposed upon reckless communication can survive First Amendment scrutiny. **See Knox**, **supra** at 1157 n.10 (noting that **Watts** and **Black** do not address "whether the First Amendment requires a particular mental state for threat

prosecutions," but that it was unnecessary to resolve the issue because Knox was found to have acted intentionally).

In a concurring and dissenting opinion, Justice Wecht, joined by Justice Donohue, opined that the *Knox* majority should have considered "whether the First Amendment **requires** proof of specific intent, or whether the Amendment would tolerate punishment of speech based upon proof of only a lesser *mens rea* of recklessness or knowledge." *Id*. at 1162 (Wecht, J. concurring and dissenting) (emphasis in original). Justice Wecht observed that the federal courts of appeals are not in agreement on "whether the subjective intent of a speaker is a necessary component of an actual true threat." *Id*. at 1162-63. Justice Wecht offered the following summary of the different views:

> The First, Second, Third, Fourth, Sixth, Seventh, and Eighth Circuits have determined that the *Black* Court did not impose a subjective intent requirement upon the analysis. Those Circuits eschew such an element, and instead apply an objective test focused upon either a hypothetical reasonable speaker or a hypothetical reasonable recipient/listener.
>
> The Fifth and Eleventh Circuits adopted a more general reasonable person test, with no specific reliance upon either the speaker or the listener.
>
> The Ninth and Tenth Circuits read *Black* as requiring the true threats analysis to focus upon the speaker's subjective intent to intimidate a person or group of persons.

*Id*. at 1162-63 (citations omitted).

Justices Wecht and Donohue would adopt the position of the Ninth Circuit and hold, *inter alia*, that the First Amendment prohibits penalizing or

proscribing a statement unless "the speaker specifically intended to intimidate the victim or victims, or intended his expression to be received as a threat to the victim or victims." *Id*. at 1165 (Wecht, J. concurring and dissenting).

While the *Knox* majority chose not to decide the issue that Justices Wecht and Donohue would have reached, it did indicate that it was "not fully aligned with the Ninth Circuit's view that, under *Black*, a specific intent to threaten is the *sine qua non* of a constitutionally punishable threat." *Id*. at 1157 n.10 (internal quotation marks omitted). Hence, we are not convinced that application of the minority view in *Knox* is appropriate in this case. However, as discussed above, the *Knox* majority did state its view that the *Black* opinions evidenced that seven justices of the United States Supreme Court "believed the First Amendment necessitates an inquiry into the speaker's mental state." *Id*. at 1157. As such, our Supreme Court has indicated that it would not apply a wholly objective test focused only upon the effects a threat had upon the recipients as some of the federal circuit courts employ.[7] *Id*.

Mindful of the legal backdrop discussed above, we hold that in the context of the special circumstances attendant with threats made in a school

_____

[7] We note that "a majority of federal appellate courts . . . has declined to read *Black* as altering the traditional objective standard" in conducting a true-threats analysis. *State v. Meadows*, 197 A.3d 464, 477 (Conn.App. 2018) (collecting cases).

setting, a threat made with the mental state of recklessness, *i.e.*, with conscious disregard of the risk of causing terror, constitutes a true threat falling outside the scope of the protections of the First Amendment. **See Elonis**, **supra** at 2015 (Alito, J. concurring in part and dissenting in part) ("There can be no real dispute that recklessness regarding a risk of serious harm is wrongful conduct. . . . Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway."). **Accord**, **e.g.**, **New York Times Co. v. Sullivan**, 376 U.S. 254, 279-80 (1964) (holding First Amendment permits state to authorize the award of damages for defamation of a public figure upon proof that the statement was made recklessly).

Therefore, we conclude that the Commonwealth's evidence in the instant case established that Appellant communicated a true threat that was not protected by the First Amendment. The circumstances surrounding Appellant's statement that he "wanted to beat the record of 19" evidenced that it was a threat,[8] and that Appellant communicated it with a conscious

---

[8] Appellant's attempt to analogize the circumstances of this case with those at issue in **Tinker v. Des Moines Indep. Cmty. Sch. Dist.**, 393 U.S. 503 (1969), is preposterous. In that case, the High Court held that a school rule prohibiting students from wearing black arm bands to protest the war in Vietnam was an unconstitutional violation of the students' freedom to express their opinion. Those students' "silent, passive expression of opinion" in favor of peace over violence, **id**. at 508, was in no way similar to Appellant's threat to commit mass murder.

disregard for the likelihood that his words would engender fear in those who heard them. Appellant's subjective mental state was such that he acted with knowledge of its wrongness, for the events of the day in question, described above in detail, do not suggest that Appellant spoke to express an opinion, or that he was just jesting, or even that he was merely negligent in inducing fear in his schoolmates.

Rather, Appellant, who had cultivated an image among his classmates as one who relished the thought of death to human beings, must have known the effect that his words would have upon his fellow students in the wake of the Parkland shooting. Yet he chose to utter them anyway, in school, in the hallway between classes, for anyone and everyone around him to hear. We do not believe the First Amendment is or ever was intended to give Appellant a protected right to do so. **Accord Elonis**, **supra** at 2027-28 (Thomas, J. dissenting) ("We generally have not required a heightened mental state under the First Amendment for historically unprotected categories of speech. . . . I see no reason why we should give threats pride of place among unprotected speech.").

Having concluded that Appellant's adjudication does not violate his First Amendment rights, we turn to Appellant's challenges to the statute on the basis of vagueness. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does

not encourage arbitrary and discriminatory enforcement." ***Commonwealth v. Bullock***, 913 A.2d 207, 212 (Pa. 2006) (internal quotation marks omitted). Appellant suggests that § 2706 is unconstitutional under this doctrine both on its face and as applied.  Appellant's brief at 2.

Again, § 2706(a)(3) defines the crime of terroristic threats as follows: "A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to: . . . cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience."  18 Pa.C.S. § 2706(a)(3).

This Court held long ago that the statute is not facially void for vagueness.  ***See Commonwealth v. Chance***, 458 A.2d 1371, 1375 (Pa.Super. 1983) (holding § 2706 is not unconstitutionally vague because it describes "the category of unlawful activity with sufficient precision as to place a person charged with such an offense on notice as to what conduct was proscribed by the statute"); ***Commonweatlh v. Green***, 429 A.2d 1180, 1183 (Pa.Super. 1981) (same).  Appellant presents no argument to convince us that those decisions are no longer valid and applicable.

Appellant also claims that the statute is invalidly-vague as applied because he had no reason to expect, based upon the language of the statute, that he could be in violation of it through the combination of two different statements that he said weeks apart from each other.  Appellant's brief at 24.

This argument hinges on the merits of his belief that neither of his statements, standing alone, constituted a threat. *Id*.

As noted above, we conclude that Appellant's statement that he wanted to "beat the record of 19," made only days after the "record" for deaths in a high school shooting was established, was the threat that sustains his adjudication. Appellant's prior communications about his affinity for "death and such" to his fellow students were not necessary to make the expression of his aspirations to "beat the record" a threat. Rather, the fact that he had shared those views with students, who are all potential targets of his threat, merely contributed to the totality of the circumstances establishing that Appellant acted with reckless disregard for the risk of causing terror when he announced aloud, in school, for anyone around him to hear, a desire to become the most prolific high school shooter in history. We therefore hold that the language of § 2706 is sufficiently clear to have put Appellant on notice that his conduct was prohibited. His vagueness challenge merits no relief.

In conclusion, we reiterate that our decision of these difficult issues is informed by the special public interest, long-acknowledged by this Court, in confronting the impact of instances of gun-related violence in our schools:

> [A] threat by a student to bring a gun to school can in no way be treated as [a] joking statement which can be casually disregarded. . . . [I]t is of paramount importance that our schools must be kept as centers of learning free of fear for personal safety. This concept of safety encompasses the notion of teachers and students being secure and free from the fear of becoming victims of senseless violence. However, freedom from this type of grim fear is destroyed by statements such as Appellant's. Because this

is precisely the type of impairment to personal security that the terroristic threats statute was enacted to avoid, we find Appellant's adjudication of delinquency proper.

*In re B.R.*, *supra* at 639 (citations and unnecessary capitalization omitted).

Dispositional order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/10/2019