# STATE OF CONNECTICUT *v.* CODY M.*
## (SC 20213)

Robinson, C. J., and Palmer, McDonald,
D'Auria, Mullins and Ecker, Js.**

*Syllabus*

Convicted, after a jury trial, of two counts of violating a standing criminal
protective order and two counts of threatening in the second degree,
the defendant appealed to the Appellate Court, claiming, inter alia, that
his conviction of two counts of violating a protective order violated the
constitutional prohibition against double jeopardy and that the trial
court improperly instructed the jury as to the one of the counts of
violating a protective order by incorrectly defining the term "harassing."
The defendant's conviction stemmed from his actions toward the victim
when they appeared before a juvenile court for a hearing relating to
their children. At the time, the defendant was subject to a standing
criminal protective order that, with limited exceptions, prohibited him
from contacting the victim in any manner and from threatening or harass-
ing her. As the hearing began, the defendant attempted to engage in

---

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we
decline to identify any party protected or sought to be protected under a
protective order or a restraining order that was issued or applied for, or
others through whom that party's identity may be ascertained.

** The listing of justices reflects their seniority status on this court as of
the date of oral argument.

State *v.* Cody M.

small talk with the victim, telling her that he still loved her and asking her why she had blocked his phone calls, but she ignored him. The defendant's tone then changed, he whispered to the victim that she was going to have problems, and, when she looked at him, he mouthed that he was going to kill her. The Appellate Court affirmed the judgment of conviction, concluding, inter alia, that the defendant's double jeopardy claim failed because his conviction of each count of violating a protective order was supported by a separate and distinct act even though those acts arose from the same conversation. The Appellate Court also concluded that the trial court did not improperly instruct the jury as to the definition of the term "harassing." On the granting of certification, the defendant appealed to this court. *Held*:

1. The Appellate Court correctly concluded that the defendant's conviction of two counts of violating a standing criminal protective order did not violate the constitutional prohibition against double jeopardy: because the purpose of the statute (§ 53a-223a) under which the defendant was convicted is to protect victims of domestic violence by increasing the penalty for violating protective orders, the legislature intended to punish separately each discrete act that violates a protective order, rather than to punish only the course of action that those acts constitute, and, therefore, conviction of multiple counts is permitted for distinct acts that constitute separate violations of § 53a-223a; in the present case, the defendant's statements, although made in quick succession, constituted two distinct acts in violation of two different conditions of the protective order and, thus, were separately punishable, as the defendant's act of whispering to the victim that he loved her and asking her why she had blocked his phone calls violated the protective order's no contact provision, and the defendant's escalation of his behavior by asserting that she was going to have problems and mouthing that he would kill her was in violation of the order's provision prohibiting him from threatening the victim.

2. The defendant could not prevail on his claim that the Appellate Court improperly upheld the trial court's jury instruction as to the second count of violating a standing criminal protective order because, even if the trial court incorrectly defined the term "harassing," any error was harmless beyond a reasonable doubt; the state having alleged in that second count that the defendant had violated the protective order by either threatening or harassing the victim, and the jury having found the defendant guilty of threatening in the second degree on the basis of the same underlying conduct as that on which the second count was based, the jury necessarily found the defendant guilty of threatening the victim as charged in the second count.

(*Two justices concurring and dissenting in one opinion*)

Argued November 14, 2019—officially released September 21, 2020***

***September 21, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Cody M.

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of criminal violation of a standing criminal protective order and threatening in the second degree, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *O'Keefe, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Sheldon, Elgo* and *Flynn, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*John L. Cordani, Jr.*, assigned counsel, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Laura DeLeo*, senior assistant state's attorney, and *Bruce R. Lockwood*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, C. J. The principal issue in this certified appeal is whether multiple convictions for violation of a standing criminal protective order, arising from a series of statements made during a court hearing by the defendant, Cody M., to the person protected by the order, violate the constitutional protection from double jeopardy. The Appellate Court affirmed the judgment, rendered after a jury trial, convicting the defendant of two counts of criminal violation of a standing criminal protective order in violation of General Statutes § 53a-223a,[1] one count of threatening in the second degree

---

[1] General Statutes § 53a-223a provides: "(a) A person is guilty of criminal violation of a standing criminal protective order when an order issued pursuant to subsection (a) of section 53a-40e has been issued against such person, and such person violates such order.

"(b) No person who is listed as a protected person in such standing criminal protective order may be criminally liable for (1) soliciting, requesting, commanding, importuning or intentionally aiding in the violation of the standing criminal protective order pursuant to subsection (a) of

State *v.* Cody M.

in violation of General Statutes (Rev. to 2015) § 53a-62 (a) (2),[2] and one count of threatening in the second degree in violation of § 53a-62 (a) (3). *State* v. *Meadows*, 185 Conn. App. 287, 290, 197 A.3d 464 (2018). We granted the defendant's petition for certification to appeal,[3] and the defendant now claims that the Appellate Court incorrectly concluded that (1) his conviction of two counts of violating a standing criminal protective order did not violate his constitutional right against double jeopardy, and (2) the trial court's jury instruction correctly defined the term "harassing" with respect to the penalty enhancement under § 53a-223a (c) (2). We conclude that the defendant's conviction of two counts of violating a standing criminal protective order did not violate his right against double jeopardy and that any possible instructional error in the trial court's definition of "harassing" was harmless, and, accordingly, we affirm the judgment of the Appellate Court.

section 53a-8, or (2) conspiracy to violate such standing criminal protective order pursuant to section 53a-48.

"(c) Criminal violation of a standing criminal protective order is a class D felony, except that any violation that involves (1) imposing any restraint upon the person or liberty of a person in violation of the standing criminal protective order, or (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person in violation of the standing criminal protective order is a class C felony."

[2] As the Appellate Court aptly noted, "[No.] 16-67 of the 2016 Public Acts . . . amended subsection (a) of § 53a-62 by redesignating the existing subdivisions (2) and (3) as subdivision (2) (A) and (B) without modifying the language of that provision. We refer to the 2015 revision of § 53a-62 (a) (3) because that is the statute under which the defendant was charged and convicted." *State* v. *Meadows*, 185 Conn. App. 287, 290 n.1, 197 A.3d 464 (2018).

[3] We granted the defendant's petition for certification to appeal, limited to the following issues: "Did the Appellate Court [correctly] conclude that (1) the defendant's constitutional right to be free from double jeopardy was not violated when he was convicted of two counts of violation of a standing criminal protective order on the basis of different words spoken to the protected person during a single, brief, and uninterrupted statement, and (2) the jury was properly instructed that to 'harass' means to 'trouble, worry or torment' for purposes of an enhanced penalty for violating a standing criminal protective order?" *State* v. *Meadows*, 330 Conn. 947, 947–48, 196 A.3d 327 (2018).

State *v.* Cody M.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. On May 12, 2015, the trial court, *Keegan, J.*, issued a standing criminal protective order against the defendant, ordering that he, inter alia, "not assault, threaten, abuse, harass, follow, interfere with . . . stalk" or "contact . . . in any manner, including by written, electronic or telephone contact," the victim, who is the mother of his children. One exception to the order permitted contact with the victim "for purposes of visitation, as directed by [the] family court." Subsequently, on September 1, 2015, both the victim and the defendant were present at a juvenile court hearing. The defendant, who was incarcerated at the time, was brought to the hearing and placed near the victim.

When the hearing began, the defendant tried to engage in "small talk" with the victim, but she ignored him and did not make eye contact. The victim testified that the defendant had "whispered to me that he still loved me and had asked me why I had a block on the phone and that I said I would never do this to him . . . . [W]hen I wasn't responding to him, his tone changed and he told me that 'you're going to have problems when I get home, bitch,' and . . . I looked at him, and he told me that he was going to fucking kill me." The conversation was only as loud as a whisper, except for the last statement, which the defendant mouthed to the victim. The victim then told the defendant to stop threatening her, and he responded that he was not. The victim thought the statements were threats, and she was afraid. At some point, an assistant attorney general present for the hearing informed the court that the defendant was speaking to the victim.

After the hearing ended, a judicial marshal removed the defendant from the courtroom. Once the defendant was outside of the courtroom, he continued to make remarks about the victim, saying, "I'm gonna get that bitch when I get out. . . . I'm gonna kill that fucking

State *v.* Cody M.

bitch, I'm gonna fuck that bitch up, I'm gonna fucking kill her.'' Subsequently, the defendant reiterated these statements while meeting with a social worker, also stating that, ''if he's not with [the victim], he's going to make sure nobody else is with her,'' and that, ''if she chooses not to be with him, he will beat the f'ing shit out of her.'' He also said ''he would make her another Tracey Morton.''[4]

In the operative information,[5] the state charged the defendant with two counts of violation of a standing criminal protective order and two counts of threatening in the second degree.[6] The case was tried to a jury, which found the defendant guilty on all four counts, and the trial court rendered a judgment of conviction in accordance with the jury's verdict.[7]

The defendant appealed from the judgment of conviction to the Appellate Court, which affirmed the judgment of conviction. *State* v. *Meadows*, supra, 185 Conn.

---

[4] It appears that the defendant's reference to ''Tracey Morton'' is a misstatement of the name of the victim in a high profile case of family violence. See part I A of this decision.

[5] The state initially charged the defendant with one count of violation of a standing criminal protective order, threatening in the second degree, and disorderly conduct in violation of General Statutes § 53a-182.

[6] Count one of the operative information provides: ''In the Superior Court of Connecticut, New Haven judicial district, geographical area twenty-three, Assistant State's Attorney Laura DeLeo accuses the defendant, CODY [M.], of VIOLATION OF A STANDING CRIMINAL PROTECTIVE ORDER, and charges that, on or about September 1, 2015, at or about the location of 239 Whalley Avenue, in the city of New Haven, CODY [M.], did violate the terms of a standing criminal protective order that had issued against him, to wit: by having contact with the protected person, in violation of [§] 53a-223a.''

Count two provides: ''In the Superior Court of Connecticut, New Haven judicial district, geographical area twenty-three, Assistant State's Attorney Laura DeLeo accuses the defendant, CODY [M.], of VIOLATION OF A STANDING CRIMINAL PROTECTIVE ORDER, and charges that, on or about September 1, 2015, at or about the location of 239 Whalley Avenue, in the city of New Haven, CODY [M.], did violate the terms of a standing criminal protective order that had issued against him, to wit: by threatening and harassing the protected person, in violation of [§] 53a-223a.''

[7] The trial court sentenced the defendant to a total effective sentence of eight years imprisonment with seven years of special parole.

State *v.* Cody M.

App. 308. With respect to the issues relevant to this certified appeal, the Appellate Court first rejected the defendant's claim that his two convictions for violating a standing criminal protective order were a double jeopardy violation, concluding that each conviction was supported by a "separate and distinct [act], and it matters not that they arose from the same conversation."[8] Id., 298. The Appellate Court also disagreed with the defendant's claim that the trial court improperly defined the term "harassing conduct" when instructing the jury as to the second count of violating a standing criminal protective order, holding that the definition used was consistent with the decision in *State* v. *Larsen*, 117 Conn. App. 202, 209 n.5, 978 A.2d 544, cert. denied, 294 Conn. 919, 984 A.2d 68 (2009). See *State* v. *Meadows*, supra, 299–301. This certified appeal followed. See footnote 3 of this opinion. Additional facts and procedural history will be set forth in the context of each claim on appeal.

I

We begin with the defendant's claim that his two convictions under § 53a-223a for violations of a standing criminal protective order violated the constitutional prohibition against double jeopardy. The Appellate Court's analysis of this issue centered on the premise that the defendant violated "two separate provisions" of the order; one count originated from his initial contact, and the second count was based on the defendant's threat to the victim. See *State* v. *Meadows*, supra, 185 Conn. App. 298. The Appellate Court considered each violation "distinct" and deemed its decision in *State* v. *Nixon*, 92 Conn. App. 586, 886 A.2d 475 (2005), which had held a series of knife stabs to be a single, continuous act, inapposite. See *State* v. *Meadows*, supra, 297–99.

---

[8] Although the defendant did not preserve this double jeopardy claim at trial, the Appellate Court considered it pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). See *State* v. *Meadows*, supra, 185 Conn. App. 293–94.

State *v.* Cody M.

"A defendant's double jeopardy claim presents a question of law, over which our review is plenary. . . . The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb. The double jeopardy clause [applies] to the states through the due process clause of the fourteenth amendment. . . . This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial. . . . Although the Connecticut constitution does not include a double jeopardy provision, the due process guarantee of article first, § 9, of our state constitution encompasses protection against double jeopardy." (Citation omitted; internal quotation marks omitted.) *State* v. *Bernacki*, 307 Conn. 1, 9, 52 A.3d 605 (2012), cert. denied, 569 U.S. 918, 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013).

"In accordance with *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), double jeopardy claims challenging the constitutional validity of convictions pursuant to two distinct statutory provisions are traditionally analyzed by inquiring whether each provision requires proof of a fact of which the other does not require proof. . . . We prefer a different form of analysis in the circumstances of this case, in which only one statutory provision is at issue.[9] The proper double jeopardy inquiry when a defendant is convicted of multiple violations of the *same* statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute." (Citations omitted; emphasis in original; footnote added; internal quotation marks

_____

[9] For an example of a case that reviews a similar issue but analyzes double jeopardy under separate statutory provisions, see *State* v. *Culver*, 97 Conn. App. 332, 338–39 n.7, 904 A.2d 283, cert. denied, 280 Conn. 935, 909 A.2d 961 (2006).

State *v.* Cody M.

omitted.) *State* v. *Garvin*, 242 Conn. 296, 304, 699 A.2d 921 (1997). Put differently, we must determine the "unit of prosecution" intended by the legislature in enacting § 53a-223a. See *Bell* v. *United States*, 349 U.S. 81, 83, 75 S. Ct. 620, 99 L. Ed. 905 (1955) (employing unit of prosecution analysis to determine whether Congress intended "cumulative punishment for each woman" transported in violation of Mann Act); *State* v. *Garvin*, supra, 306–307 (legislature intended unit of prosecution to be number of bail bonds breached rather than number of times defendant failed to appear); *State* v. *Tweedy*, 219 Conn. 489, 498–99, 594 A.2d 906 (1991) (legislature intended "the course of committing a larceny . . . as the time frame for completion of the offense of robbery" (internal quotation marks omitted)).

"The issue, [although] essentially constitutional, becomes one of statutory construction." *State* v. *Rawls*, 198 Conn. 111, 120, 502 A.2d 374 (1985). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same gen-

State *v.* Cody M.

eral subject matter . . . .''[10] (Internal quotation marks omitted.) *State* v. *Terwilliger*, 314 Conn. 618, 653–54, 104 A.3d 638 (2014).

A

We begin our analysis by determining the requisite unit of prosecution under § 53a-223a. The defendant asserts that the Appellate Court incorrectly concluded that the statutory language of § 53a-223a, specifically, the word "involves" in subsection (c), clearly indicates that the legislature intended the unit of prosecution to be on a "transactional basis." The defendant contends that a violation of a protective order is a continuing offense and that, because the conversation at issue in this case lasted only for a short time, it should be viewed as a single violation. Finally, the defendant requests that we apply the rule of lenity to resolve any statutory ambiguity on this point.

In response, the state argues that the text and purpose of § 53a-223a support viewing separate violations as distinct criminal acts, and, as a result, each distinct contact or threat to the victim may be punished. The state argues that a violation of a protective order is more analogous to sexual assault, which is a separate act crime, than kidnapping, which is a continuous act crime. The state contended at oral argument before this court that § 53a-223a is unambiguous and argues in its brief that the statute clearly permits multiple convic-

[10] "Of course, [w]e have long held that [c]riminal statutes are not to be read more broadly than their language plainly requires . . . . Moreover, [a] penal statute must be construed strictly against the state and liberally in favor of the accused. . . . [A]mbiguities are ordinarily to be resolved in favor of the defendant. . . . In the interpretation of statutory provisions [however] the application of common sense to the language is not to be excluded. . . . Thus, [e]ven applying the view that a penal statute should be strictly construed, the words of a statute are to be construed with common sense and according to the commonly approved usage of the language." (Citations omitted; internal quotation marks omitted.) *State* v. *Love*, 246 Conn. 402, 412 n.13, 717 A.2d 670 (1998).

State *v.* Cody M.

tions for separate acts because, inter alia, the statutory text does not expressly state that a violation is a continuing act. The state supports this argument by contrasting § 53a-223a with a related statute, General Statutes § 53a-222, which governs violations of conditions of release and includes language specifically indicating that a violation is a continuing offense. See General Statutes § 53a-222 (a) ("intentionally violates one or more of the imposed conditions of release"). We agree with the state and conclude that the defendant's multiple convictions in this case did not violate his double jeopardy rights.

We begin with the language of § 53a-223a, which provides in relevant part: "(a) A person is guilty of criminal violation of a standing criminal protective order when . . . such person violates such order.

* * *

"(c) Criminal violation of a standing criminal protective order is a class D felony, except that any violation that involves (1) imposing any restraint upon the person or liberty of a person in violation of the standing criminal protective order, or (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person in violation of the standing criminal protective order is a class C felony."

The plain language of the statute does not define when a violation begins and ends; instead, it states only that one is guilty if "such person violates such order." General Statutes § 53a-223a (a). The statute can reasonably be read to prohibit either a course of conduct or discrete acts, each of which may be sufficient to constitute a violation. As a result, we must look outside the statutory text for indicators of legislative intent. When § 53a-223a is construed in light of similar, surrounding statutes, it is apparent the legislature purposefully omitted language that was included in those provisions. We are cognizant of "the principle that the

State *v.* Cody M.

legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction. . . . Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed. . . . That tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or [nonaction] will have upon any one of them.'' (Internal quotation marks omitted.) *State* v. *Fernando A.*, 294 Conn. 1, 21, 981 A.2d 427 (2009). In contrast, § 53a-222 follows a similar structure to § 53a-223a but provides in relevant part: ''(a) A person is guilty of violation of conditions of release in the first degree when, while charged with the commission of a felony, such person is released . . . and intentionally violates *one or more* of the imposed conditions of release. . . .'' (Emphasis added.) This ''one or more'' language in § 53a-222 (a) demonstrates that, regardless of whether a defendant violates the conditions of release once or more than once, he nevertheless is guilty of only one count. The absence of such language in § 53a-223a indicates that the legislature did not have a similar intent with respect to a standing criminal protective order and, as a result, supports a reading permitting violations of multiple provisions of an order to support multiple convictions under the statute.

We disagree with the defendant's construction of § 53a-223a, which does not resolve the ambiguity in the statute. Specifically, the defendant relies on subsection

State *v.* Cody M.

(c) of the statute and contends that the legislature's use of ''the open-ended term 'involve' thereby impl[ies] that the occurrence or transaction constituting the violation of the protective order can be broader than the acts in the proscribed list.'' We disagree. The word ''involves'' in subsection (c) is irrelevant to determining the unit of prosecution because it does not, in the first instance, define whether a violation, as provided in subsection (a), is a discrete act or a continuing course of conduct. Simply because a violation involves threatening does not, under the statutory text, preclude punishment for additional violations because subsection (c) functions only as a sentence enhancement for certain types of violations that are made punishable under subsection (a), namely, those implicating harassing or threatening conduct. In the absence of explication of what it means to ''[violate] such order'' in subsection (a) itself, the word ''involves'' in subsection (c) provides no meaningful guidance.

Additionally, under the defendant's interpretation, persons who violate an order repeatedly would be shielded from prosecution because any violation would be continuous. See *State* v. *Snook*, 210 Conn. 244, 262, 555 A.2d 390 (''If we adopted the defendant's reasoning, the commission of one act likely to impair the health and morals of a minor would insulate the perpetrator from further criminal liability for any additional acts of the same character perpetrated on the same minor in subsequent encounters. Such a result defies rationality.''), cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989); *In re Walker* v. *Walker*, 86 N.Y.2d 624, 628, 658 N.E.2d 1025, 635 N.Y.S.2d 152 (1995) (''Under [the] appellant's argument, a violator already penalized for [wilfully] failing to obey an order of protection would garner immunity from further official sanction for persistent, separate violations . . . . Such an approach is in no way compelled or warranted by the

State *v.* Cody M.

governing statutes, sentencing principles or reasonable statutory analysis. Its incongruous and untenable result would also constitute an invitation to violate and no incentive to obey.'' (Citation omitted.)).

The result portended by the defendant's interpretation of § 53a-223a, which suggests that violations of that statute are continuous in nature, is inconsistent with the purpose of the statute, as demonstrated by its legislative history. The legislature enacted § 53a-223a as No. 96-228 of the 1996 Public Acts, entitled ''An Act Concerning Domestic Violence.'' In this act, the legislature created the standing criminal restraining order[11] in response to the well-known tragedy involving Tracey Thurman Motuzick, who had been abused by her ex-husband after his release from jail in 1996. See 39 H.R. Proc., Pt. 10, 1996 Sess., p. 3326, remarks of Representative Ellen Scalettar. In response to this notorious case, the legislature created a new type of restraining order that judges could issue at a defendant's sentencing in a family violence case. Id. The bill's leading proponent, Representative Scalettar, stated that the bill ''imposes a significant penalty on those who violate the order. It would be a [c]lass D [f]elony. . . . [T]his bill will give to victims of domestic violence . . . increased protection and increased peace of mind, which they well deserve.''[12] Id., p. 3327. Under the defendant's proposed

_____

[11] This language was later amended to read ''standing criminal protective order . . . .'' Public Acts 2010, No. 10-144, § 6.

[12] The legislative history also indicates that the legislature was aware of the statute's ambiguity at the time of its enactment. Representative Arthur J. O'Neill discussed this issue: ''[T]he way it reads, it seems to say that a person is guilty of a violation if a person violates the order. . . . [I]s that existing language? *It seems a little circular to me* . . . .'' (Emphasis added.) 39 H.R. Proc., supra, p. 3341. Representative Scalettar responded: ''I believe that is existing language . . . . It would either be [General Statutes § 46b-38c] or the civil restraining orders statute.'' Id. Earlier in the discussion, Representative Scalettar explained that ''[t]his is the same language as used in [§] 46b-38c (e) with respect to criminal protective orders *and it would have the same meaning as that statute has been interpreted.*'' (Emphasis added.) Id., p. 3340. The statutory language in civil statutes does not, how-

State *v.* Cody M.

interpretation, a defendant may contact a victim and later assault her, each in violation of an order, but only be convicted of one count. Such a result would be inconsistent with the legislature's desire to protect victims by increasing the penalty for violating protective orders, suggesting that § 53a-223a should be read to permit criminal liability for each discrete act in violation of an order.[13] As the unit of prosecution is no longer ambiguous after considering the surrounding statutory scheme and legislative history, we decline to apply the rule of lenity, as urged by the defendant. See, e.g., *State* v. *Lutters*, 270 Conn. 198, 219, 853 A.2d 434 (2004) ("courts do not apply the rule of lenity unless a reasonable doubt persists about a statute's intended scope *even after resort to the language and structure, legislative history, and motivating policies of the statute*" (emphasis in original; internal quotation marks omitted)).

Numerous other jurisdictions consider protective order violations to be discrete acts. For example, in *Jacobs* v. *State*, 272 So. 3d 838 (Fla. App. 2019), review denied, Florida Supreme Court, Docket No. SC19-1008 (November 22, 2019), the Florida District Court of Appeal affirmed the defendant's conviction of two counts of violating a stalking injunction after he approached and threatened the victim. Id., 839–40. The court held his two violations to be "distinct criminal acts," namely,

ever, provide assistance when determining the unit of prosecution. Because of the importance of this issue, the legislature may want to consider the consistency of § 53a-223a with the surrounding penal statutes.

[13] Indeed, separate punishment for each act that constitutes a violation of a protective order is responsive to the nature of domestic violence offenses. "An abuser's recurrent exertion of power and control over the survivor pervades the survivor's experience, and without effective intervention, battering *typically escalates in frequency and severity over time.* . . . Intimate partner abuse rarely consists only of a single, isolated event; instead, the abusive partner more commonly engages in an ongoing process of violence and control." (Emphasis added; footnotes omitted.) J. Stoever, "Enjoining Abuse: The Case for Indefinite Domestic Violence Protection Orders," 67 Vand. L. Rev. 1015, 1023–24 (2014).

State *v.* Cody M.

one when he approached the victim and a second when he contacted her. Id., 841. The fact that the acts occurred nearly simultaneously was of no consequence because "[e]ach act is of a separate character and type, and each is born of a separate impulse." Id., 842; see also *Triggs* v. *State*, 382 Md. 27, 50, 852 A.2d 114 (2004) (upholding defendant's conviction on eighteen counts because "each separate [telephone] call constitutes contact in violation of a protective order"); *Commonwealth* v. *Housen*, 83 Mass. App. 174, 177, 982 N.E.2d 66 (permitting multiple convictions for violations of protective order for separate contacts with victim and her children), review denied, 465 Mass. 1105, 989 N.E.2d 898 (2013); *State* v. *Strong*, 380 Mont. 471, 478, 356 P.3d 1078 (2015) (upholding trial court's denial of defendant's motion to dismiss three of four counts of violating order of protection arising from four telephone calls made over seven hours); *State* v. *McGee*, 135 N.M. 73, 78–79, 84 P.3d 690 (2003) (conviction of several counts of violating order of protection, when four telephone calls were made within minutes of each other, did not violate double jeopardy), cert. denied, 135 N.M. 160, 85 P.3d 802 (2004); *In re Walker* v. *Walker*, supra, 86 N.Y.2d 626, 630 (upholding defendant's convictions for three violations of a protective order when defendant sent victim three letters); *Hill* v. *Randolph*, 24 A.3d 866, 871–73 (Pa. Super. 2011) (permitting multiple contempt counts for violations of protective order when defendant entered victim's home and assaulted victim); *Cable* v. *Clemmons*, 36 S.W.3d 39, 43 (Tenn. 2001) (upholding three of defendant's six convictions for criminal contempt for violating protective order in one interaction when defendant "abused [the victim] physically; produced a knife and threatened to kill her; and then vandalized [the victim's] personal property"); *State* v. *Medina*, Docket No. 48053-1-II, 2016 WL 6599649, *4 (Wn. App. November 8, 2016) (decision without pub-

lished opinion, 196 Wn. App. 1054) (upholding seven counts for violation of court order for multiple text messages sent in one day because ''[e]ach time [the defendant] messaged [the victim], he took the affirmative action of picking up the phone, typing a message to [the victim], and pressing 'send' ''), review denied, 187 Wn. 2d 1028, 391 P.3d 448 (2017); *State* v. *Brown*, 159 Wn. App. 1, 11, 248 P.3d 518 (2010) (''the unit of prosecution is each single violation of a no-contact order''), review denied, 171 Wn. 2d 1015, 249 P.3d 1029 (2011).

B

Having determined that the legislature permitted convictions for multiple distinct acts that constitute separate violations of § 53a-223a, we must next consider whether the defendant's statements in this case constituted a single act or multiple acts. According to the defendant, a violation of a protective order is analogous to the knife assaults in *State* v. *Nixon*, supra, 92 Conn. App. 589, which were held to be a single, continuous act. The defendant argues that the temporal closeness of the statements is determinative when deciding whether the violations should be considered one act or two. In response, the state contends that the jury could have reasonably found two distinct acts because the defendant violated two distinct conditions of the protective order and each was a completed offense. Additionally, the state argues that the two acts were separated by an ''intervening event,'' that is, when the victim ignored the defendant. We agree with the state and conclude that each conviction was supported by a separate act.

''[D]istinct repetitions of a prohibited act, however closely they may follow each other . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes

State *v.* Cody M.

where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute].'' (Citations omitted; internal quotation marks omitted.) *State* v. *Miranda*, 260 Conn. 93, 122–23, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002).

''We look to the following factors to determine whether, on this record, the defendant engaged in distinct courses of conduct and, therefore, separately punishable [acts]: (1) the amount of time separating the acts; (2) whether the acts occurred at different locations; (3) the defendant's intent or motivation behind the acts; and (4) whether any intervening events occurred between the acts, such that the defendant had the opportunity to reconsider his actions.'' *State* v. *Ruiz-Pacheco*, 336 Conn. 219, 241, 244 A.3d 908 (2020).

We conclude that the defendant's statements constitute two distinct acts because the victim's resistance, effectuated by her silence, was an intervening event causing the defendant to escalate his behavior. The defendant's initial statement, in which he explained that he loved the victim and inquired as to why she had a block on her phone, constituted a completed offense, namely, contacting the victim in violation of that provision of the order. In contrast, the second set of statements occurred only after ''[the victim] wasn't responding to him'' and ''his tone [had] changed.'' The defendant stated that the victim was ''going to have problems when [he got] home, bitch.'' The victim then ''looked at him, and he told [her] that he was going to fucking kill [her].'' What separates the defendant's statements into two criminal acts is the defendant's clear escalation, showing a ''fresh impulse'' to move from nonthreat-

State *v.* Cody M.

ening conversation to threatening conversation.[14] *State*
v. *Schoonover*, 281 Kan. 453, 497, 133 P.3d 48 (2006).
Put differently, the statements supporting count one are
a nonthreatening contact, but, upon realizing the victim
was not responding, the defendant effectuated a differ-
ent purpose and made a threatening statement to the
victim, supporting a second, distinct count. This renders
this case distinguishable from *State* v. *Nixon*, supra, 92
Conn. App. 586, on which the defendant relies. Compare
id., 591 ("the defendant twice stabbed the same victim,
at the same place and during the same time period, with
the same instrument, with the same common intent to
inflict physical injury"), with *State* v. *Brown*, 299 Conn.
640, 653–54, 11 A.3d 663 (2011) (first act of attempted
robbery ended after "the victim slapped the gun away
. . . then escaped," and second act began when defen-
dant chased and shot victim). This escalation, after the
victim's intervening resistance, separates the statements
into discrete acts. But see *Whylie* v. *United States*, 98
A.3d 156, 165 (D.C. 2014) (one week break in calls by
defendant does not necessarily create "fresh impulse").

Although the defendant made his statements at two
points close in time, the criminal acts nevertheless are
distinct. "It is not dispositive in a double jeopardy analy-
sis that multiple offenses were committed in a short
time span and during a course of conduct that victim-
ized a single person." *State* v. *Urbanowski*, 163 Conn.

---

[14] At oral argument before this court, the state asserted that, if the defen-
dant had said only "I'm going to kill you," that would be one distinct act
supporting one count of violating a protective order, even though it violated
two conditions, namely, a contact and a threat. According to the state,
charging the defendant in this case with two counts without running afoul of
double jeopardy protections "depends on some separation in time, however
brief." Therefore, the state concedes the limits on its ability to charge a
defendant for protective order violations. In other words, if the violations
in this case arose from a single act, such as a violation for contacting the
victim and a violation for threatening her, as presented by the "I'm going
to kill you" hypothetical, there could be only one charge.

State *v.* Cody M.

App. 377, 393, 136 A.3d 236 (2016), aff'd, 327 Conn. 169, 172 A.3d 201 (2017); see also *State* v. *D'Antonio*, 274 Conn. 658, 717, 877 A.2d 696 (2005) (conviction of two counts of interference with officer stemming from acts toward different officers does not violate double jeopardy, even though acts were "within minutes of each other"); *State* v. *Scott*, 270 Conn. 92, 100, 851 A.2d 291 (2004) (conviction of two counts of sexual assault was permissible, "irrespective of the brief period of time separating them"), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005); *State* v. *Lytell*, 206 Conn. 657, 667, 539 A.2d 133 (1988) (defendant's actions toward two victims supported conviction of two counts of robbery, "irrespective of whether the robbery was spatially linked with another robbery"); *State* v. *Marsala*, 93 Conn. App. 582, 589, 889 A.2d 943 (each telephone call violates § 53a-183 (a), "regardless of how close in time the calls were made"), cert. denied, 278 Conn. 902, 896 A.2d 105 (2006). Accordingly, we conclude that the defendant's two convictions for violation of a standing criminal protective order did not violate the constitutional protection against double jeopardy.

II

The defendant next claims that the Appellate Court improperly upheld the trial court's jury instruction with respect to the second count of violation of a standing criminal protective order because it incorrectly defined "harassing" as "to trouble, worry, or torment" for purposes of the penalty enhancement under § 53a-223a (c). The defendant asserts that (1) harassment involves "persistence," which is absent from the trial court's definition, (2) the legislature did not intend "harassing" to mean "troubling" or "worrying," (3) the lower standard utilized by the trial court will encompass virtually any contact in violation of a protective order because defendants may easily "trouble" or "worry" their victims, and (4) the Appellate Court incorrectly relied on

State *v.* Cody M.

other cases utilizing these jury instructions. In response, the state argues the trial court's definition was proper, and, in any event, any error was harmless beyond a reasonable doubt. We agree with the state and conclude that any error in the trial court's instruction was harmless.[15]

Because the defendant did not object to the jury instructions at trial; *State* v. *Meadows*, supra, 185 Conn. App. 299;[16] we review his claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "*Golding* provides that a defendant may prevail on an unpreserved claim when (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Sawyer*, 335 Conn. 29, 49–50, 225 A.3d 668 (2020).

For purposes of this *Golding* analysis, we assume that the trial court's instructional definition of harassing was improper, but we nevertheless conclude that,

---

[15] We note that the defendant contends that (1) the claimed instructional error was not harmless beyond a reasonable doubt, and (2) contrary to the United States Supreme Court's decision in *Neder* v. *United States*, 527 U.S. 1, 15–17, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), the Connecticut constitution does not permit harmless error review if a jury instruction incorrectly states the elements of the crime. For its part, the state contends that this court should not consider the defendant's state constitutional claim because the argument is inapplicable to this case and the claim fails on the merits.

[16] Although the defendant did not object to the instructions at trial or expressly seek review under *State* v. *Golding*, supra, 213 Conn. 239–40, the Appellate Court extended review under *State* v. *Elson*, 311 Conn. 726, 754–55, 91 A.3d 862 (2014), because the claim was one of "constitutional magnitude." *State* v. *Meadows*, supra, 185 Conn. App. 299. We note that preservation and reviewability are not at issue in this certified appeal, and we consider the defendant's claim accordingly.

State *v.* Cody M.

because the jury found the defendant guilty of threatening as charged in the third count, the jury necessarily found him guilty of threatening the victim as charged in connection with the second count, as the charges were based on the same underlying conduct. As such, any error as to the definition of "harassing" was harmless.[17] Under § 53a-223a (c) (2), a defendant is guilty of a class C felony for criminal violation of a protective order for "threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person in violation of the standing criminal protective order . . . ." In the present case, the trial court instructed the jury on count two in the following manner: "The defendant is charged in count . . . two with criminal violation of a standing criminal protective order. . . . For you to find the defendant guilty of this charge, the state must prove

---

[17] The defendant argues that the state abandoned the harmless error analysis by failing to brief it below. Specifically, the defendant argues that the state briefed only that the instructional error was waived under *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), and plain error. The state counters that it essentially briefed harmlessness below by arguing "the absence of 'manifest injustice' under the plain error doctrine." We agree with the state.

We recognize that the state bears the burden of establishing harmlessness. See, e.g., *State* v. *Peeler*, 271 Conn. 338, 384, 857 A.2d 808 (2004) ("[i]f the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt" (internal quotation marks omitted)), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). Because this is the state's burden, the Appellate Court has declined to reach harmlessness when the state has failed to argue the issue on appeal. See, e.g., *State* v. *Liam M.*, 176 Conn. App. 807, 824 n.14, 172 A.3d 243, cert. denied, 327 Conn. 978, 174 A.3d 196 (2017); *State* v. *Perez*, 147 Conn. App. 53, 124, 80 A.3d 103 (2013), aff'd, 322 Conn. 118, 139 A.3d 654 (2016).

In the present case, however, the state has sufficiently asserted harmlessness below to merit our review. First, the defendant did not clearly brief either plain error or *Golding* review in his initial brief to the Appellate Court. The state, therefore, could not be sure under what standard the defendant was proceeding. Second, the state's argument asserting that there was no manifest injustice with respect to plain error implicitly incorporated a harmless error analysis. As such, we will proceed to analyze harmlessness in this certified appeal.

State *v.* Cody M.

the following elements beyond a reasonable doubt. . . .
[T]he first element is that a court issued a standing
criminal protective order against the defendant. . . .
The second element is that the defendant violated a
condition of the order. To violate a condition means to
act in disregard of or to go against the condition. *In this
case, the state alleges that threatening or harassing
the* [*victim*] was forbidden by the order, and you have
the order. As far as what's the definition of a threat,
use the same definition that I'm going to give you on
threatening.[18] As far as what's harassing, harassing is
to trouble, worry, or torment; that's the legal definition.
Trouble, worry, or torment." (Emphasis added; foot-
note added.)

In *Hedgpeth* v. *Pulido*, 555 U.S. 57, 61, 129 S. Ct. 530,
172 L. Ed. 2d 388 (2008), the United States Supreme
Court held that, when a jury is instructed on multiple
theories of guilt and one is improper, the error may
be reviewed for harmlessness.[19] "An instructional error

[18] With respect to the third count, charging threatening in violation of
§ 53a-62, the trial court instructed: "A threat can . . . be punishable [only]
when it is a true threat, that is, a threat that a reasonable person would
understand is a serious expression of an intent to harm or assault and not
mere puffery, bluster, jest, or hyperbole, or a—and then you see the little
arrow up there, I added something—or a spontaneous act of frustration. In
determining whether the threat is a true threat, consider the particular
factual context in which the allegations—in which the allegedly threatening
conduct occurred, which could include the reaction of the person allegedly
being threatened and the defendant's conduct before and after the alleged
threatening conduct."

[19] The defendant contends that the harmlessness rule in *Neder* v. *United
States*, 527 U.S. 1, 15–17, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), guides
the analysis in the present case. See id., 17 ("[when] a reviewing court
concludes beyond a reasonable doubt that the omitted element was uncon-
tested and supported by overwhelming evidence, such that the jury verdict
would have been the same absent the error, the erroneous instruction is
properly found to be harmless"). We disagree. Although the court in *Hedg-
peth* v. *Pulido*, supra, 555 U.S. 57, relied on *Neder* to extend harmlessness
to a multiple theories of guilt case, which was not at issue in *Neder*, it
indicated that the "substantial and injurious effect" standard applied rather
than the uncontested element and overwhelming evidence analysis used in
*Neder*. Id., 61–62. For this reason, we do not reach the defendant's claim

State *v.* Cody M.

arising in the context of multiple theories of guilt no more vitiates all the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted.'' (Emphasis omitted.) Id. When reviewing instructional errors based on multiple theories of guilt, ''a reviewing court finding such error should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.' '' Id., 58, quoting *Brecht* v. *Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); see also *Skilling* v. *United States*, 561 U.S. 358, 414 n.46, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) (*Hedgpeth*'s harmless error analysis ''applies equally to cases on direct appeal'').

Federal courts of appeals applying this harmlessness standard to cases involving multiple theories of guilt have required varying degrees of proof of harm.[20] See *Sorich* v. *United States*, 709 F.3d 670, 674 (7th Cir. 2013) (''[w]e have described the [harmless error] inquiry . . . as a question of whether the trial evidence was such that the jury must have convicted the petitioners on both [alternative] theories''), cert. denied, 571 U.S. 1131,

that the Connecticut constitution does not permit harmless error review of element instructional errors or the issue of ''whether [this court should] adopt the controversial *Neder* rule as a state constitutional matter'' under *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992).

[20] ''[*Hedgpeth*] requires a reviewing court to determine whether the relevant error 'had substantial and injurious effect or influence in determining the jury's verdict.' However, the circuits are divided in their interpretation of this standard. Some [federal courts of appeals] have interpreted the rule as imposing a less demanding standard on the defendant-appellant to establish grounds for reversal, merely requiring it to be shown, for example, that the jury did not necessarily make the findings to rely on the valid theory of guilt. Other [courts], however, impose a more demanding standard, for example, finding an error harmless unless the defendant-appellant can show not only that the jury did not necessarily rely on the valid theory of guilt, but also had evidence that could rationally lead to an acquittal on the basis of the valid theory.'' E. Khalek, Note, ''Searching for a Harmless Alternative: Applying the Harmless Error Standard to Alternative Theory Jury Instructions,'' 83 Fordham L. Rev. 295, 295–96 (2014).

State *v.* Cody M.

134 S. Ct. 952, 187 L. Ed. 2d 786 (2014); *United States*
v. *Jefferson*, 674 F.3d 332, 361 (4th Cir.) ("if the evidence
that the jury necessarily credited in order to convict
the defendant under the instructions given . . . is such
that the jury must have convicted the defendant on the
legally adequate ground in addition to or instead of
the legally inadequate ground, the conviction may be
affirmed" (internal quotation marks omitted)), cert.
denied, 568 U.S. 1041, 133 S. Ct. 648, 184 L. Ed. 2d 482
(2012); *United States* v. *Skilling*, 638 F.3d 480, 482 (5th
Cir. 2011) (discussing how one way to show "an [alter-
native theory] error is harmless" is "if the jury, in con-
victing on an invalid theory of guilt, necessarily found
facts establishing guilt on a valid theory"), cert. denied,
566 U.S. 956, 132 S. Ct. 1905, 182 L. Ed. 2d 807 (2012);
see also *United States* v. *McKye*, 734 F.3d 1104, 1110 n.6
(10th Cir. 2013) (not relying on *Hedgpeth* but concluding
that "the submission of an alternative theory for making
[a] finding cannot sustain the verdict unless it is possible
to determine the verdict rested on the valid ground"
or "the jury necessarily made the findings required to
support a conviction on the valid ground" (internal quo-
tation marks omitted)). Nevertheless, we are persuaded
by the common thread in several of these cases that
permits a finding of harmlessness if the jury necessarily
found facts to support the conviction on a valid theory.

In the present case, the state charged the defendant
with violating a criminal protective order under two
alternative theories, threatening *or* harassing the victim.
The defendant does not raise an instructional error
claim as to the trial court's instruction on threatening.[21]

_____

[21] The defendant does argue that there was a limiting instruction in place
that restricted the jury on the evidence it could consider under counts three
and four, so the jury could not have relied on the same evidence for each
count. This is inconsistent with the record. The trial court provided several
limiting instructions, including one that limited what evidence could be
considered under each count. But this instruction actually provided that
evidence regarding certain statements made by the defendant should be
considered under the first two counts. As a result, there was less evidence

State *v.* Cody M.

As the jury found the defendant guilty on count three for threatening, the jury necessarily found that the defendant threatened the victim in violation of the criminal protective order in connection with count two.[22] See *United States* v. *Jefferson*, supra, 674 F.3d 362–63 (considering jury's findings on other counts in harmlessness analysis); *United States* v. *Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011) ("[T]he jury's guilty verdict on the separate substantive count of bribery [of a public official] in violation of 18 U.S.C. § 201 confirms beyond any reasonable doubt that the jury would have convicted [the defendant] of honest services fraud . . . . Any error

to prove intent in connection with the third and fourth counts, and the limiting instruction would not affect the jury's verdict on these counts.

The court instructed the jury, after hearing evidence on the May hearing at which the protective order was put in place, to limit the use of certain statements made by the defendant. Initially, the court limited the statements in the following manner: "[The defendant's] statements in part are offered as circumstantial evidence of what his mental state might've been on September 1 with regard to count three, which is a specific intent crime, and count four, which—in which he's charged with uttering a threat with—with reckless disregard of the consequences that might occur, and I'll explain further in my final instructions, okay?" Then, the court corrected its original instruction and stated: "I said the statements of—recorded on May 12 were admitted—the statements of the defendant were recorded for a limited purpose, and I said [that] they're offered to show his intent with regard to the threatening. I misspoke there, and I'll go through these all again, and I'll have a list. Actually, they're offered with regard to [the defendant's] intent on the violation of the standing criminal restraining order counts and not the threatening, okay?"

[22] In a statement before the court and outside the presence of the jury, defense counsel conceded that the factual basis for count three is incorporated into count two. Defense counsel stated: "So, the proposed limiting instruction that I am asking for is that, if you find beyond a reasonable doubt [that] the defendant is guilty of threatening in the second degree as alleged in count three of the information, you may use that finding when determining whether the defendant is also guilty beyond a reasonable doubt of committing the crime of violating the standing criminal restraining order, as alleged in count two of the information.

\* \* \*

"[*The*] *defense cannot argue and would concede that* . . . [*count*] *three is incorporated into count* . . . *two and, therefore, could be a basis of this violation.*" (Emphasis added.)

State *v.* Cody M.

concerning the jury instruction was harmless.''), cert. denied, 566 U.S. 981, 132 S. Ct. 2119, 182 L. Ed. 2d 881 (2012). In the present case, it is ''clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error . . . .'' *Neder* v. *United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). As a result, we conclude that any instructional error as to count two was harmless under the fourth prong of *Golding*. See, e.g., *State* v. *Peeler*, 271 Conn. 338, 399, 857 A.2d 808 (2004) (''we need not reach the merits of the defendant's constitutional claims because, even if we were to assume that the defendant's claims are valid, the state has established beyond a reasonable doubt that any impropriety was harmless''), cert. denied, 546 U.S. 845, 126 S.C. 94, 163 L. Ed. 2d 110 (2005).

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, D'AURIA and MULLINS, Js., concurred.

ECKER, J., with whom McDONALD, J., joins, concurring in part and dissenting in part. I agree with the majority that multiple, distinct acts constitute separate violations of a standing criminal protective order, contrary to General Statutes § 53a-223a.[1] I disagree, however, that the statements made in the present case by the defendant, Cody M., were separate and distinct acts.

---

[1] General Statutes § 53a-223a provides in relevant part: ''(a) A person is guilty of criminal violation of a standing criminal protective order when an order issued pursuant to subsection (a) of section 53a-40e has been issued against such person, and such person violates such order.

* * *

''(c) Criminal violation of a standing criminal protective order is a class D felony, except that any violation that involves (1) imposing any restraint upon the person or liberty of a person in violation of the standing criminal protective order, or (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person in violation of the standing criminal protective order is a class C felony.''

State *v.* Cody M.

The record reflects that the defendant's statements were uttered within seconds of each other in a continuous and uninterrupted stream of contact with the victim. In my view, there was neither an intervening event between the defendant's statements nor a change in the defendant's intent; his statements concerned the same general subject matter and were undertaken with a singular purpose. The defendant therefore committed only a single violation of the standing criminal protective order, for which he may be punished only once under the double jeopardy clause. Accordingly, I respectfully dissent from part I B of the majority opinion. I agree with the majority that any alleged error in the jury instruction on the definition of "harassing" was harmless and, therefore, join part II of the majority opinion.

The record reflects that there was a valid standing criminal protective order, which prohibited the defendant from, among other things, (1) "assault[ing], threaten[ing], abus[ing], harass[ing], follow[ing], interfer[ing] with, or stalk[ing]" the victim, or (2) "contact[ing] the [victim] in any manner . . . ." On September 1, 2015, the defendant was in the custody of the Department of Correction, which transported the defendant to a juvenile court proceeding regarding his children with the victim. Despite the existence of a formal court order prohibiting the defendant from contacting the victim, except as "allowed for purposes of visitation, as directed by [the] family court," he was placed in a seat at the same table as the victim in the courtroom, with nothing but one empty chair between them. At some point during the proceeding, the defendant began "trying to make small talk" with the victim. Specifically, the defendant whispered to the victim that he still loved her and asked her why she had a block on her phone. The defendant also reminded the victim that she had said she "would never do this to him . . . ." The victim "just ignored" the defendant and kept her eyes focused on the trial

State *v.* Cody M.

judge. The defendant's "tone changed," and he told the victim that she was "going to have problems" when he got "home, bitch," which "caught [the victim's] attention . . . ." The victim looked at the defendant, who mouthed "that he was going to fucking kill" her. The victim responded by saying "stop threatening me, I can hear you . . . ." The defendant replied "I didn't or I'm not." One of the attorneys informed the trial judge that the defendant was "speaking to the [victim] while Your Honor is presiding." The trial judge admonished the defendant that "this is not the time for visit[ation] or socialization."

On the basis of his in-court statements to the victim, the defendant was charged with two counts of violating a standing criminal protective order under § 53a-223a and one count of threatening under General Statutes (Rev. to 2015) § 53a-62 (a) (2). Specifically, count one charged the defendant with violation of a standing criminal protective order "by having contact with" the victim, count two charged the defendant with violation of a standing criminal protective order "by threatening and harassing" the victim, and count three charged the defendant with threatening the victim. The defendant also was charged, in count four of the information, with a second count of threatening on the basis of threats he made to the victim outside of the courtroom after the conclusion of the juvenile court proceeding. The jury found the defendant guilty of all of the crimes charged. The trial court sentenced the defendant to five years of incarceration on the first count of violation of a standing criminal protective, followed by a consecutive sentence of three years of incarceration and seven years of special parole on the second count of violation of a standing criminal protective order. The trial court also imposed two concurrent one year terms of incarceration on the threatening counts, to be served concurrently with the first count of violation of a standing criminal protective order. Thus, the total effective sen-

State *v.* Cody M.

tence was eight years of incarceration followed by seven years of special parole.

On appeal, the defendant claims that, on these facts, his conviction under counts one and two of two offenses under the same statutory provision, § 53a-223a, violates his constitutional right to be free from double jeopardy. As the majority rightly points out, "[t]he proper double jeopardy inquiry when a defendant is convicted of multiple violations of the same statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute." (Emphasis omitted; internal quotation marks omitted.) Part I of the majority opinion, quoting *State* v. *Garvin*, 242 Conn. 296, 304, 699 A.2d 921 (1997). Thus, to resolve the issue on appeal, we must "determine the 'unit of prosecution' intended by the legislature in enacting § 53a-223a."

I agree with the majority that, in enacting § 53a-223a, the legislature intended "to permit criminal liability for each discrete act in violation" of a standing criminal protective order. I further agree with the majority that, to determine whether the defendant's statements constituted a single act or multiple acts, we should consider the following factors: "(1) the amount of time separating the acts; (2) whether the acts occurred at different locations; (3) the defendant's intent or motivation behind the acts; and (4) whether any intervening events occurred between the acts, such that the defendant had the opportunity to reconsider his actions." (Internal quotation marks omitted.) Part I B of the majority opinion, quoting *State* v. *Ruiz-Pacheco*, 336 Conn. 219, 241, 244 A.3d 908 (2020). Our agreement ends, however, with the application of these factors, which leads the majority to conclude that the defendant's statements during the juvenile court proceeding can be separated into multiple, discrete acts. Instead, given the proximity in time and space, the defendant's singular intent, and

State *v.* Cody M.

the lack of any intervening events between the defendant's statements, it is clear to me that the defendant committed a single violation of the standing criminal protective order under § 53a-223a.

It is undisputed that the first and second factors in the analysis, namely, the amount of time separating the defendant's statements and the location where they were uttered, favor the defendant. The defendant and the victim were seated in the same place in the courtroom throughout the encounter. The amount of time between the defendant's initial statements and his threatening statements was extremely brief. Indeed, as the trial court observed, "this is a trial about what happened in the course of about ten seconds." These factors are not dispositive, of course, because spatial and temporal proximity alone do not always trigger a double jeopardy violation. "[D]istinct repetitions of a prohibited act, however closely they may follow each other . . . may be punished as separate crimes without offending the double jeopardy clause." (Citation omitted; internal quotation marks omitted.) *State* v. *Miranda*, 260 Conn. 93, 122, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002). But the immediate proximity of the statements in place and time are an important part of any analysis turning on discreteness and severability, and the fact that the statements were made during a brief and uninterrupted verbal contact with the victim strongly supports the conclusion that the defendant committed a single violation of the standing criminal protective order rather than two separate violations.

The third and fourth factors only bolster this conclusion. I reject the majority's characterization of the victim's silence as an "intervening event" that separated the defendant's initial affectionate statements from the threatening statements that followed immediately thereafter. To begin with, the victim's response— whether silent or spoken—strikes me as a red herring

State *v.* Cody M.

in this particular context. The defendant's verbalizations to the victim over a ten second time span constituted one act or transaction, whether delivered as a monologue or part of a dialogue, in the same way that a single, short telephone call from the defendant to the victim would have been one act or transaction, regardless of the parties' speaking roles. If the majority's analysis is sustainable, it must explain why its logic would not subject a defendant to multiple violations of § 53a-223a (perhaps many, if the communication consisted of a back and forth dialogue) for a single, short telephone call consisting of content similar to that occurring here. I believe that an unacceptable degree of arbitrariness enters the analysis when the number of criminal violations depends on the speaker's punctuation choices, sentence or paragraph structure, or the conversational turns occurring in a brief, uninterrupted communication.

Moreover, even if such considerations were appropriate in the present context, it is more accurate, in my view, to characterize the victim's silence as a *non*event, or perhaps a *continuation* of the same event, rather than an intervening event in these circumstances. The victim did nothing and said nothing. There was no change of location or alteration of any other objective condition that would fit our normal understanding of what constitutes an intervening event. Silence, of course, can mean many different things, and the victim's failure to respond clearly meant something to the defendant, but it changed nothing except his emotional stratagem; he quickly replaced affectionate overtures with angry threats in his effort to persuade the victim to unblock his phone calls. The fact is that nothing happened between the defendant's initial statements and his threatening statements—nothing was said and nothing was done by the victim or anyone else in the courtroom. I am unaware of any case law, and the majority

State *v.* Cody M.

has cited none, holding that silence or inaction is an intervening event in the double jeopardy context.[2]

This brings me to the final factor on which the majority relies—its perception of a change in the defendant's intent. This point, in my estimation, confuses the defendant's singular intention during the prohibited contact—to persuade the victim to accept his phone calls—with the rapid change in tone or tactics used to achieve that objective. The fact that the defendant substituted threats for affection does not mark the end of one crime and the beginning of another. Whether through statements of endearment or intimidation, his purpose and intent remained the same, namely, to manipulate the victim into unblocking his phone number. I disagree with the majority that, during the few seconds between the defendant's initial statements and his threatening statements, he developed a " 'fresh impulse' " or a "different purpose . . . ." Part I B of the majority opinion; see *Whylie* v. *United States*, 98 A.3d 156, 165 (D.C.

_____

[2] The one case on which the majority relies, *State* v. *Brown*, 299 Conn. 640, 11 A.3d 663 (2011), illustrates precisely what is missing from this case— an actual intervening event that creates a temporal or spatial break sufficient to provide the defendant with a "clear opportunity . . . to reconsider his actions" and "[to formulate] a new criminal intent that was separate and distinct from the intent behind the initial [offense]." *State* v. *Ruiz-Pacheco*, supra, Conn. ; see id., (holding that defendant's two assault convictions did not violate double jeopardy clause because there was "[a] distinct break" in both time and place in fighting, and second assault was motivated by "a separate and distinct criminal intent"). In *Brown*, the defendant attempted to rob the victim, but the victim fought back by "slapp[ing] the gun away," "struggl[ing] for control of the gun," and "escap[ing] and [running] down" the street. *State* v. *Brown*, supra, 653. The victim's escape was an intervening event because it represented a fork in the road; the defendant could either chase after the victim or flee the scene of the crime. The defendant chose to chase the victim, shoot him, and rob him. Id., 653–54. The defendant's first crime (attempted robbery) and his second crime (completed robbery) were "two separate and severable crimes"; id., 654; because they were separated by time and space, the victim's escape, and the defendant's formulation of a new and distinct criminal intent. The facts of *Brown* contrast sharply with the facts of the present case, and *Brown* provides no support for the outcome reached here.

State *v.* Cody M.

2014) (holding that it would be "rank speculation" to conclude that one week break between phone calls "cor responded to a fork in the road and a fresh impulse not in evidence"); cf. *United States* v. *Chipps*, 410 F.3d 438, 449 (8th Cir. 2005) (under "impulse test," which "treat[s] as one offense all violations that arise from that singleness of thought, purpose or action, which may be deemed a single impulse," there was only "a single impulse underlying [the defendant's] assaultive conduct" in light of "the uninterrupted nature of the attack on [the victim]" (internal quotation marks omitted)); *Hagood* v. *United States*, 93 A.3d 210, 226 (D.C. 2014) (describing "fresh impulse or fork-in-the-road test," which asks whether, "at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest," and holding "that something more than a momentary interruption is required to sever the singular continuous possession of a weapon into distinct, separately punishable criminal actions" (internal quotation marks omitted)).

Under the majority's holding today, an individual who violates a standing criminal protective order by uttering an uninterrupted stream of vile threats commits only one violation of § 53a-223a, but an individual who precedes, intersperses, or concludes his threats with "small talk" commits two or more separate violations of the statute. I can perceive no reason, and the majority offers none, why the legislature would want to punish the latter individual more harshly in this context than the former. Indeed, given the purpose of the statute and the legislative policy that it was designed to implement— to protect victims of domestic violence—it makes no sense to punish individuals who pose an unequivocal threat to the victim less harshly than those who do not. Such an outcome is not only illogical but also results "in convictions that are disproportionate to an offender's

State *v.* Cody M.

conduct,'' in violation of the double jeopardy clause. *State* v. *Morales*, 174 Wn. App. 370, 388, 298 P.3d 791 (2013); see id., 387–88 (holding that threat to cause bodily harm to single identified person at particular time and place was only one unit of prosecution of harassment, regardless of how many times threat was communicated to others).

The defendant's statements were made as part of a brief, one-sided verbal contact with the victim. As such, his conduct constituted only a single violation of the standing criminal protective order under § 53a-223a. Because the defendant stands convicted of two offenses under the same statutory provision for a single act or transaction in violation of the double jeopardy clause, I would reverse the defendant's conviction under count one of the information and remand the case for resentencing.[3] See *State* v. *Miranda*, supra, 260 Conn. 130 (''[u]nder the aggregate package view . . . the court may reconstruct the sentence in any way necessary to ensure that the punishment fits both the crime and the defendant''). I therefore dissent from part I B of the majority opinion.

––––––––––––––

[3] Although the defendant was convicted twice under the same statute for the same conduct, his conviction under count two of the information is the greater of the two offenses because any violation of a standing criminal protective order that involves, among other things, threatening or harassing is a class C felony rather than a class D felony. See General Statutes § 53a-223a (c); see also General Statutes § 53a-35a (1) (A) (7) and (8) (providing that class C felony is punishable by ''a term not less than one year nor more than ten years,'' whereas class D felony is punishable by ''a term not more than five years''). It is well established that, ''when a defendant has been convicted of greater and lesser included offenses'' in violation of the double jeopardy clause, ''the trial court must vacate the conviction for the lesser offense . . . .'' *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013).